James E. ARNOLD, Appellant,

v.

UNITED STATES, Appellee.

No. 84–1259.

District of Columbia Court of Appeals.

Argued Sept. 13, 1985.

Decided June 18, 1986.

Mark Rochon, Public Defender Service, with whom James Klein and Mark Carlin, Public Defender Service, Washington, D.C., were on brief, for appellant.

Kenneth J. Melilli, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before NEBEKER, TERRY and ROGERS, Associate Judges.

TERRY, Associate Judge:

This case arose from two incidents that occurred in the early morning hours of May 22, 1983. Three people were robbed at gunpoint as they left Gallagher's Pub on Connecticut Avenue, N.W., between 2:00 and 2:45 a.m. Then, at 3:40 a.m., near 14th and Chapin Streets, N.W., there was either an armed robbery or a dispute over a drug transaction, depending on whom one believed. When appellant was arrested immediately after the Chapin Street incident, he had in his possession part of the proceeds of the Connecticut Avenue robbery.

Following a jury trial, appellant was convicted of five counts of armed robbery,[1] three counts of assault with intent to commit robbery while armed,[2] one count of assault with intent to kill while armed,[3] one count of assault with a dangerous weapon,[4] and one count of carrying a pistol without a license.[5] Appellant asserts four grounds for reversal. He contends that the trial court erred in refusing to sever the charges relating to the Connecticut Avenue incident from the charges relating to the Chapin Street incident; that the prosecutor's examination of several government witnesses and her closing argument constituted misconduct which resulted in substantial prejudice to the defense; that the prosecutor made an improper missing witness argument which substantially prejudiced his defense to the Connecticut Avenue charges; and that the trial court abused its discretion in refusing to poll the jurors individually as to each count. Although we are disturbed by some of the prosecutor's actions, we find no reversible error; hence we affirm all of the convictions.

1. D.C. Code §§ 22–2901 (1981) and 22–3202 (1985 Supp.).

2. D.C. Code §§ 22–501 (1981) and 22–3202 (1985 Supp.).

3. D.C. Code §§ 22–501 (1981) and 22–3202 (1985 Supp.).

4. D.C. Code § 22–502 (1981).

5. D.C. Code § 22–3204 (1981).

## I

### A. *The Connecticut Avenue Incident*

Peter Stein, Stephen Brickel, and Carol Wyrick were robbed shortly after leaving Gallagher's Pub. They were walking north in the 3600 block of Connecticut Avenue when two men approached and announced a stick-up. One of the men had a big gun; the other—later identified as appellant—had two guns. The robbers took $40 from Stein and also took Wyrick's pocketbook, which contained, among other things, a brown cloth pouch and two pairs of earrings. At one point Stein was hit over the head by one of the robbers. Throughout the robbery the gunmen told the victims to keep their heads down. Stein did so, but Wyrick kept looking up every time one of the robbers spoke. After the robbers made their getaway in a white car with a dark top, the three victims flagged down a passing police cruiser to report what had happened.

The next day Stein and Wyrick looked at an array of photographs which included appellant's picture. Wyrick made no identification, but Stein picked out the photograph of appellant and said he believed that it depicted the robber with two guns. At trial Brickel testified that he too was shown photographs by Detective Robert Raffety and that he picked out one photograph; Detective Raffety, however, testified that he did not show any photographs to Brickel. All three victims failed to identify appellant in a lineup conducted on June 1, ten days after the robbery.

### B. *The Chapin Street Incident*

Two witnesses, Catherine Shaw and Mona Lisa Showell, testified that appellant and another man approached Maurice Lee, Tyrone Stewart, Joseph Harrison, and a fourth man whose name they did not know, and asked about purchasing some marijuana. Appellant and his companion then pulled guns and ordered the four men to lie face down on the ground. They took money from Harrison, keys from Lee, money and chains from Stewart, and money and keys from the fourth man. Showell and Shaw were also ordered to lie on the ground. While all this was going on, one of the robbers struck Stewart in the head with his gun.

At about that time, Philip Cheseman and his girl friend, Patrice Davage, were driving along Chapin Street, on their way home after having just purchased some marijuana. Cheseman attempted to stop the robbery and exchanged shots with the robbers, who also fired several shots in the direction of the victims as they lay on the ground. The robbers ran west on Chapin Street. Cheseman chased them briefly, but then returned to the scene of the robbery to await the police.

When the police arrived, they spoke to some of the victims, who managed to describe only one of the robbers. Appellant, who matched the description, was arrested a short time later coming out of a nearby park. He did not resist or run. He had no weapons, little money, and no proceeds from the second robbery, but he did have in his possession the brown pouch and two pairs of earrings which had been taken from Carol Wyrick an hour earlier. Appellant told Detective Raffety that the earrings were his. The police conducted an immediate show-up, and Cheseman identified appellant as one of the robbers.

About two months after the robbery, on July 18, Detective Raffety showed a photograph of the June 1 lineup to Catherine Shaw, who picked out two men, neither of whom was appellant. On June 25, 1984, almost a year later, Raffety showed Shaw an array of photographs, and Shaw identified appellant's photograph as depicting one of the two robbers. She also identified him in court.

### C. *Appellant's Defense*

With regard to the Connecticut Avenue robbery, appellant's defense was alibi and misidentification. As to the Chapin Street incident, the defense was that the complainants had fabricated their story about a robbery to cover up their armed assault on appellant after a dispute over a drug deal.

Bobbi Jean White, appellant's girl friend at the time of the incidents, and Pamela Leysath, White's sister, testified that they spent the evening and early morning of May 21–22 with appellant. The three of them went to a party at appellant's brother's house from 10:30 p.m. until 2:00 or 2:30 a.m. They then left and drove in a white Mercedes to 14th Street near V Street in order to get some ice cream. As they walked from the car, White saw a pouch lying in the street. She picked it up, opened it, and found some earrings inside. Since her dress had no pockets, she gave it to appellant to hold for her.

As they were all walking back to the car after buying the ice cream, appellant stopped to talk to a man standing in a group with some other people. He bought some marijuana from that man, but after examining it, he was not satisfied with it. The two men became involved in an argument, which escalated into a fight; then gunshots were fired. Appellant ran from the group, heading west on Chapin Street. White and Leysath were extremely upset and frightened, so they left (without waiting for appellant) and drove to White's house, where they learned that appellant had been arrested. Neither of the women saw appellant with a gun at any time that night.

## II

Appellant contends that the trial court abused its discretion by denying his motion to sever the counts relating to the first robbery from the counts relating to the second robbery. We find no abuse of discretion.

In the District of Columbia, joint trial of offenses properly joined[6] is favored because it "expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burdens upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once." *Parker v. United States*, 404 F.2d 1193, 1196 (9th Cir.1968) (footnote omitted), *cert. denied*, 394 U.S. 1004, 89 S.Ct. 1602, 22 L.Ed.2d 782 (1969), quoted with approval in *Johnson v. United States*, 398 A.2d 354, 367 (D.C.1979). This court has "consistently recognized a presumption in favor of joinder of offenses of a similar character...." *Robinson v. United States*, 452 A.2d 354, 358 (D.C. 1982) (citation omitted). "Only when a defendant cannot receive a fair trial should a severance be ordered." *Baxter v. United States*, 352 A.2d 383, 385 (D.C.1976).

A motion for severance on the ground of prejudicial joinder is committed to the sound discretion of the trial court. The denial of such a motion will not be reversed on appeal unless the defendant can convince this court that there was a clear abuse of that discretion. *Leasure v. United States*, 458 A.2d 726, 728–729 (D.C. 1983); *Strickland v. United States*, 389 A.2d 1325, 1332 (D.C.1978), *cert. denied*, 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 481 (1979). To meet that burden, the defendant "must show 'the most compelling prejudice' ... from which 'the court would be unable to afford protection' if both offenses were tried together.... It is not sufficient to show that the defendant would have a better chance of acquittal if the charges were tried separately." *Winestock v. United States*, 429 A.2d 519, 527 (D.C.1981) (citations omitted).

When joinder is based on the "similar character" of the offenses,[7] "a motion to sever should be granted unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, *or* (2) the evidence of each of

---

**6.** Super.Ct.Crim.R. 8(a) permits the joinder of two or more offenses in the same indictment if they "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

**7.** See note 6, *supra*.

the joined crimes would be admissible at the separate trial of the others." *Bridges v. United States*, 381 A.2d 1073, 1075 (D.C. 1977) (emphasis added; citations omitted), *cert. denied*, 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978). This means that if the denial of severance can be sustained on either ground, it will not be disturbed on appeal. *See, e.g., Cox v. United States*, 498 A.2d 231, 235–238 (D.C.1985);[8] *Crisafi v. United States*, 383 A.2d 1, 3 n. 3 (D.C.), *cert. denied*, 439 U.S. 931, 99 S.Ct. 322, 58 L.Ed.2d 236 (1978). In the instant case, the trial court based its ruling on the "separate and distinct" rationale, declining to rule on the question of whether evidence of the two crimes would be mutually admissible. The government asserts on appeal that the evidence passes both tests, but we need not decide whether that assertion is correct. Instead, we follow the course charted by the trial court and hold that appellant was not prejudiced because the evidence of the two crimes was kept sufficiently separate and distinct. Thus we do not reach what is, on this record, the more difficult question of mutual admissibility.

■ Severance may properly be denied if the evidence of the joined offenses is kept separate and distinct, provided that the case is submitted to the jury in a discrete manner, with instructions to consider the offenses separately. *See, e.g., Leasure v. United States, supra*, 458 A.2d at 729; *Arnold v. United States*, 358 A.2d 335, 339 (D.C.1976) (en banc). Appellant maintains that the government's method of proof and argument at trial prevented the jury from keeping the two incidents separate and distinct, and that the jury therefore must have

cumulated the evidence to find guilt and improperly inferred that he had a criminal disposition. We do not agree.

The government was careful to keep the evidence of the two crimes separate. The first four witnesses (Stein, Wyrick, Brickel, and Claiborne) offered testimony relating only to the first robbery. The next nine witnesses (Showell, Stewart, Cheseman, Lee, Davage, Shaw, Williams, Mulderig, and Griffin) offered testimony relating only to the second robbery.[9] The last government witness was Detective Raffety. Although he discussed both crimes, the nature of his testimony and the fact that he was the last prosecution witness enabled the jury to relate his testimony separately to the two incidents, as the trial court specifically recognized. Appellant also put on distinct defenses—misidentification as to the first incident and denial of the commission of any crime as to the second incident—which also helped the jury to keep the offenses separate and distinct.[10] In addition, the prosecutor—unlike the prosecutor in *Evans v. United States*, 392 A.2d 1015, 1022 (D.C.1978)—argued the case to the jury as two separate and distinct occurrences, first reviewing the evidence relating to one and then the evidence relating to the other.

■ The trial court instructed the jury, both at the beginning of the trial and in its final charge, that the two robberies must be viewed as separate and distinct incidents. Juries are generally presumed to have understood and followed the court's instructions. *Smith v. United States*, 315

---

8. In *Cox* we held that although the evidence of the two crimes was not kept separate and distinct, severance was properly denied on the ground of mutual admissibility. 498 A.2d at 238. Subsequent error "in the manner in which [the court] conducted the trial following its denial of severance," *id.* at 240, was held to be harmless.

9. Brickel's testimony was interrupted and then resumed after Showell testified. The interruption was plainly the fault of the government, as we shall discuss in part III-A of this opinion.

We are satisfied, however, that the jury could not reasonably have been confused or misled by what happened, since it was clear that Brickel was testifying only about the Connecticut Avenue incident.

10. Appellant's contention that if the jury decided the defense witnesses were lying about one charge, it would be less likely to believe them on the other charge, is not relevant to the question of whether the jury could keep the crimes separate and distinct.

A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). The jury's verdict shows that it did indeed keep the two incidents separate. It found appellant not guilty on one of the counts of armed robbery based on the second incident, and a colloquy between the court and the forewoman immediately after the return of the verdict revealed that the jury had reached a verdict on Monday as to one robbery and on Tuesday as to the other.[11] *See Jaggers v. United States,* 482 A.2d 786, 795 (D.C.1984). Furthermore, the verdict form listed the counts of the indictment under separate headings, "Incident Number One" and "Incident Number Two." *See Bittle v. United States,* 410 A.2d 1383, 1387 (D.C.1980). Weighing all these factors, we conclude that the trial judge was correct in finding that the jury could, and did, keep the evidence relating to the two incidents separate and distinct, and that it did not cumulate the evidence improperly to find guilt or to infer that appellant had a criminal disposition.

■ Appellant also claims that the denial of his severance motion prejudiced him because he was confounded in trying to present different defenses to the two charges. "With regard to [this] type of prejudice, no need for severance exists 'until the defendant makes a convincing showing that he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other.'" *Strickland v. United States, supra,* 389 A.2d at 1332, quoting from *Baker v. United States,* 131 U.S. App. D.C. 7, 26, 401 F.2d 958, 977 (1968), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384

(1970). Enough evidence must be proffered so that the trial court can satisfy itself that the claim is genuine. *See Strickland, supra,* 389 A.2d at 1332–1333. Appellant failed to meet either of the requirements of *Strickland.*

■ In his written motion for severance, appellant stated that he would "become embarrassed and confounded in having to present separate defenses to the two sets of charges." This was clearly not a "convincing showing" because it did not explain why he would become embarrassed and confounded. In a later oral motion, appellant's counsel said:

> I would assert to the Court that Mr. Arnold, if these cases were tried separately, would not want to testify in connection with the first case, the Connecticut Avenue case, but would in all likelihood choose to assert that right in connection with the Chapin Street case. It's a very different case that involves much more of his word versus the complainants' word. He will be forced to—if the cases are joined together, to have to make that decision differently than he would make if they were separated.

While this statement did make clear to the court in which case appellant wanted to testify, and why, it did not inform the court what his testimony might be, and thus it did not convincingly show that he had "important testimony to give." *Strickland, supra,* 389 A.2d at 1332. Furthermore, appellant failed to demonstrate convincingly a "strong need to refrain from testifying" in the Connecticut Avenue case. *Id.; see also Roldan v. United States,* 353 A.2d 292, 294 (D.C.1976). Because appellant

---

**11.** There was a note from the jury which revealed a temporary disagreement as to one of the robberies. Late in the afternoon on the first day of deliberations, which was a Monday, one of the jurors reported that he was unable to agree with his fellow jurors as to the second incident. The note was signed by both the forewoman and the dissenting juror. On Tuesday, after delivering the verdict, the forewoman told the court that the jury had reached a verdict on Monday with respect to the second incident, but not until Tuesday with respect to the first. The

combination of the note and the forewoman's colloquy with the court suggests either that the holdout juror misidentified the incident over which he was in disagreement or that the forewoman misidentified the one on which the jury reached a verdict on Monday. Although this confusion was never resolved, it does not suggest to us that the jury was "amalgamat[ing]" the evidence "into a single inculpatory mass...." *Bridges v. United States, supra,* 381 A.2d at 1075.

failed to make either part of the two-part showing mandated by *Strickland,* he cannot now claim error in the denial of severance on this ground.[12]

For all of the foregoing reasons, we conclude that the trial court did not abuse its discretion in denying appellant's motion for severance of counts.

## III

Appellant charges that the prosecutor [13] was guilty of misconduct in three respects which denied him a fair trial: (1) she introduced identification testimony which she had previously represented did not exist; (2) she improperly examined two witnesses, Stewart and Lee, and then made impermissible arguments to the jury based on their testimony; and (3) she elicited identification testimony from Detective Raffety which the court had previously suppressed. Appellant argues that these instances of alleged misconduct, both independently and cumulatively, require reversal. We shall consider each of them in turn.

### A. *Brickel's Photographic Identification*

Appellant's first claim of prosecutorial misconduct concerns the prosecutor's introduction of identification testimony from Stephen Brickel, which she had previously represented did not exist. While we conclude that the prosecutor did engage in misconduct in this instance, it did not cause substantial prejudice to the defense.

At the hearing on appellant's motion to suppress all identification testimony, Detective Raffety testified that he had shown photographs to two of the victims of the Connecticut Avenue robbery, Stein and Wy-

rick, but that no photographs had been shown to the other victim, Brickel. At trial, however, Brickel testified that Raffety had shown him some photographs and that from them he had selected a picture of one of his assailants. Defense counsel's immediate objection prevented him from saying whether it was a picture of appellant. Counsel then moved for a mistrial because of the government's failure to disclose all of the identifications. At the same time, defense counsel pointed out that she had relied on the government's representations in her opening statement and stressed that the court had ordered that no surprise identifications were to be introduced. The court then suspended the direct examination of Brickel until it could find out from Detective Raffety which photograph Brickel had selected. Later, after Detective Raffety denied that he had shown Brickel any photographs, the court went on with the trial without any further mention of the mistrial motion.

■ We must first determine whether the prosecutor's actions constituted misconduct. When the objection was made, the prosecutor said that she had just learned of Brickel's claim of having viewed the photographs twenty minutes before he took the stand. Brickel was the first witness in the afternoon session, and immediately before his testimony the court and counsel were conferring at the bench. This bench conference, in our view, offered an excellent opportunity for the prosecutor to disclose Brickel's surprise identification to the court and defense counsel. The prosecutor's justification of her failure to do so was that she had a "policy" of having each witness testify as to what he or she recalled. We

---

**12.** Appellant now asserts that he would have had important eyewitness testimony to give in the Chapin Street case. We may assume that this would be significant evidence since the two defense witnesses at trial, White and Leysath, did not see or hear much of what happened on Chapin Street. He also states that if he had testified about the Connecticut Avenue incident, his criminal record would have been revealed, creating a false issue of character and credibility in a case which turned on misidentification.

Appellant did not raise these points before the trial court, however, and therefore we will not consider them. *See Miller v. Avirom,* 127 U.S. App.D.C. 367, 384 F.2d 319 (1967). The trial court surely could not have abused its discretion by failing to grant a severance for reasons which were never brought to its attention.

**13.** The government is represented by different counsel on appeal.

fail to see, however, how such a policy could have prevented the prosecutor from telling the court and counsel what she had just learned. Since the court had carefully attempted to ensure that all identification testimony was disclosed ahead of time, the prosecutor could not claim to be unaware of the need for disclosure. We therefore conclude that the prosecutor should have revealed the possibility of additional identification testimony to the court and defense counsel as soon as she found out about it; her failure to do so amounted to misconduct.

Prosecutorial misconduct requires reversal of a conviction, however, only if the defendant suffered "substantial prejudice" as a result. *E.g., Williams v. United States,* 483 A.2d 292, 297 (D.C.1984), *cert. denied,* — U.S. —, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985); *McCowan v. United States,* 458 A.2d 1191, 1196 (D.C.1983). The test which we must apply to determine whether there has been "substantial prejudice" is a familiar one:

> whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.

*Gaither v. United States,* 134 U.S. App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (footnotes omitted), quoting from *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). In this instance we are satisfied that the jury's verdict was not "substantially swayed" by the prosecutor's lapse.

The Connecticut Avenue case cannot be regarded as close unless one accepts Bobbi Jean White's explanation of how appellant came to possess Carol Wyrick's earrings and pouch. That explanation was, at best, barely plausible. The issue affected by the

prosecutor's non-disclosure of Brickel's identification, however, was the central issue in the case: the identity of appellant as one of the robbers. Brickel did not testify that he had actually picked out appellant's photograph, though the jury could easily have inferred he had. On the other hand, Detective Raffety's testimony creates doubt about whether Brickel even saw any photographs, let alone picked out appellant as the assailant. Neither the court nor the prosecutor took any steps to mitigate the effects of the error other than to suspend Brickel's testimony until Detective Raffety could be questioned, an action which may well have compounded the problem by emphasizing the possible identification to the jury.

■ Although the issue is a close one, we believe the trial judge did not err in failing to declare a mistrial on this ground. The misconduct here was not of the same magnitude as that in *Rosser v. United States,* 381 A.2d 598, 606–609 (D.C.1977), for example, in which we reversed a conviction because the prosecutor knew of the existence of an inculpatory admission made by the defendant, misrepresented that the only statements made by the defendant were exculpatory, and then used the undisclosed statements to impeach the defendant at trial. Given the identification of appellant's photograph by another witness (Stein) [14] and the recovery of the pouch and the earrings, as well as the weakness of the defense to the Connecticut Avenue charges, we conclude that the prosecutor's actions did not result in substantial prejudice.

### B. *The Witnesses Stewart and Lee*

Appellant challenges several aspects of the prosecutor's examination of Stewart and Lee, two of the victims in the Chapin Street robbery. He maintains that the prosecutor impermissibly called the witnesses to testify in the first place; imper-

---

**14.** Even if we assume that the conflict between Brickel's and Raffety's testimony may have led the jury to disbelieve Brickel, Stein's credibility was not affected.

missibly continued to question them after they said they could not remember the events of May 22; impermissibly put certain disputed facts before the jury by asking eight leading questions, to which objections were sustained; and, in closing argument, impermissibly argued inferences from inadmissible evidence and impermissibly suggested that fear of appellant was the real reason for the witnesses' unwillingness to testify. We conclude that, for the most part, the prosecutor's examination and argument were proper, but that the eight leading questions plainly were not. Because we also conclude that these improper questions did not substantially prejudice appellant, we decline to reverse his conviction on this ground.

■ 1. Appellant's first claim is that the prosecutor should not have called these witnesses because she knew they would testify that they did not remember the events of May 22, 1983; hence, appellant contends, the prosecutor put the witnesses on the stand not to elicit their testimony, but to argue (or insinuate) that their demeanor showed they were lying about their inability to remember.[15] Initially, we note that the prosecutor did not engage in the type of conduct condemned by this court in the cases which appellant cites to support this argument.[16] The prosecutor here did not affirmatively argue her opinion that the witnesses were lying and did not create

non-existent evidence out of whole cloth; rather, she asked them questions, some of which were improper and suggestive, concerning events described by other witnesses about which she believed both Stewart and Lee should have had relevant testimony.

■ The prosecutor's stated reasons for calling these witnesses were not improper. She wanted the jury to be able to hear from the victims named in the indictment; she was concerned that the jury might draw an adverse inference against the government if they did not testify; and she wanted to test the witnesses' ability to contribute to the truth. The first two reasons are clearly legitimate and do not merit extended discussion. By calling these witnesses, if only to testify that they did not remember most of the events of May 22, the prosecutor provided the jury with all of the evidence available to the government and left it for the jury to determine whether a robbery had in fact occurred. As for the third reason, we hold that the prosecutor's desire to test these witnesses' ability to contribute to the truth was not, on the facts of this case, an impermissible motive for calling them. The witnesses had made certain statements to the police on the night of the robbery which implicated appellant as one of the robbers. Furthermore, the testimony of the other eye-

**15.** The government contends that appellant did not adequately preserve this particular misconduct issue, and that he must therefore demonstrate plain error in order to obtain reversal. *See Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc). The basis for this contention is that defense counsel objected only eight times to particular leading questions during the examination of Stewart and Lee, rather than objecting to their testimony as a whole. We reject the government's argument. Defense counsel specifically objected that the first of the two witnesses, Stewart, could not remember anything. A few moments later the court inquired about the prosecutor's purpose in questioning the witness and was apparently satisfied with her response. On this record we conclude that the issue was properly preserved for our review.

**16.** In *Hawthorne v. United States,* 476 A.2d 164 (D.C.1984), the prosecutor gave his closing argument in the first person, assuming the character of the decedent and suggesting what might have been going through his mind at the time of the murder, although there was no evidence of the decedent's state of mind. In *Powell v. United States,* 455 A.2d 405 (D.C.1982), the prosecutor strongly intimated that the defendant had fabricated his testimony and made several comments appealing to the emotions and prejudices of the jury. In *Dyson v. United States,* 418 A.2d 127 (D.C.1980), the prosecutor repeatedly expressed his personal opinion as to the truthfulness of two defense witnesses. In the most egregious case, *Villacres v. United States,* 357 A.2d 423 (D.C.1976), the prosecutor twice misstated the evidence, and in his summation he compared the murder to the crucifixion of Jesus Christ and the defendant to Pontius Pilate.

witnesses established that Stewart and Lee had been victims of a robbery. The prosecutor could reasonably have concluded that Stewart and Lee were not being fully truthful, and that they might be more candid if they were placed under oath. She therefore had a right to call these witnesses so that the jury could evaluate their story—or lack of a story. *See McBride v. State,* 477 A.2d 174, 187 (Del.1984) ("the State has a right to call a witness to the stand to testify as to relevant matters of which he has knowledge" (citations omitted)); *see also Rado v. Connecticut,* 607 F.2d 572, 581 (2d Cir.1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980); *United States v. Mayes,* 512 F.2d 637, 649 (6th Cir.) ("the government has the obligation to present such relevant testimony as the witness may possess"), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975).[17]

This case is not comparable to those in which courts have held that it is improper to call a witness solely to have him exercise his constitutional privilege against self-incrimination. *E.g., Bowles v. United States,* 142 U.S.App.D.C. 26, 31–32, 439 F.2d 536, 541–542 (1970) (en banc), *cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971); *Fletcher v. United States,* 118 U.S. App.D.C. 137, 332 F.2d 724 (1964). That is impermissible because "the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense." *Bowles v. United States, supra,* 142 U.S.App.D.C. at 31, 439 F.2d at 541. "[This] rule is grounded not only in the constitutional notion that guilt may not be inferred from the exercise of the Fifth Amendment privilege but also in the danger that a witness's invoking the Fifth Amendment in the presence of the jury will have a disproportionate impact on their deliberations." *Id.; cf. Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). No such dangers are present in a case in which the witness merely claims to be unable to remember. Furthermore, in privilege cases the witness can claim the privilege even when he has relevant testimony to offer, because the courts have determined that the societal goal underlying the privilege is more important than the testimony of a particular witness. *See* E. CLEARY, McCORMICK ON EVIDENCE § 72 (3d ed. 1984); G. LILLY, AN INTRODUCTION TO THE LAW OF EVIDENCE § 86 (1978). Claims of failed memory are not entitled to the same protection.

2. Appellant also contends that the prosecutor committed misconduct by continuing to question Stewart and Lee after they claimed they could not recall the events of May 22. He asserts that once the witnesses said they could not remember where they were that night, the prosecutor could not ask more specific questions but was obliged to stop the examination. We disagree. In the face of a general claim of failed memory, the court in its discretion may allow counsel to probe and test a witness' recollection, even by asking leading questions. *See Green v. United States,* 121 U.S.App.D.C. 111, 112, 348 F.2d 340, 341, *cert. denied,* 382 U.S. 930, 86 S.Ct. 321, 15 L.Ed.2d 342 (1965); *Roberson v. United States,* 249 F.2d 737, 742 (5th Cir.1957); G. LILLY, *supra,* § 26, at 75; *cf. Rado v. Connecticut, supra,* 607 F.2d at

---

17. *Parker v. United States,* 363 A.2d 975 (D.C. 1976), on which the government relies, is not dispositive of this issue. In *Parker* the witness had given favorable testimony to the prosecution during a grand jury proceeding. Between his grand jury appearance and the trial, however, the witness, who was known to associate with the defendant, expressed to the prosecutor his reluctance to testify against the defendant at trial. The witness had been interviewed by defense counsel before trial with the defendant present, and that interview had frightened him. After hearing the witness' testimony outside the presence of the jury, the trial court ruled that it would allow the government to claim surprise and to impeach him in accordance with D.C. Code § 14–102 (1973). We affirmed that ruling. In the case at bar, however, the prosecutor did not claim surprise and was not trying to impeach the witnesses but rather to jog their memories. We have no quarrel with *Parker,* but it has no application here.

581; *United States v. Mayes, supra,* 512 F.2d at 649; *Neville v. United States,* 272 F.2d 414, 416 (5th Cir.1959); *McBride v. State, supra,* 477 A.2d at 187.[18] In this case the witnesses gave some sort of report to the police on the day of the robbery, but at trial they claimed that they could not remember what had happened. In order to test their recollection of the events of May 22, the prosecutor had the right to probe that recollection. *See Green v. United States, supra,* 121 U.S.App.D.C. at 112, 348 F.2d at 341; *Roberson v. United States, supra,* 249 F.2d at 742; *cf. Neville v. United States, supra,* 272 F.2d at 416.

■ The right of counsel to test witnesses' memories is not absolute, of course; its exercise is subject to restraint in the discretion of the trial court. *Green v. United States, supra,* 121 U.S.App.D.C. at 112, 348 F.2d at 341; *see Trimble v. State,* 300 Md. 387, 400, 478 A.2d 1143, 1150 (1984); E. CLEARY, *supra,* § 5, at 10 ("the trial judge has a discretion, not reviewable except for abuse, to control the form of examination" (footnotes omitted)). The trial court in this case properly exercised its discretion, sustaining defense counsel's objections to improper leading questions and thus preventing the prosecutor from going beyond the bounds of fairness. On this record we hold that the prosecutor's continuing to question the witnesses after they claimed they could not remember the events of May 22 did not constitute misconduct.[19]

■ Citing *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), appellant also claims the prosecutor violated his Sixth Amendment right of confrontation by continuing to ask damaging leading questions in the face of the witnesses' failure of recollection. In *Douglas*

18. "[T]he public ... has a right to every man's evidence.... [T]here is a general duty to give what testimony one is capable of giving...." 8 J. WIGMORE, EVIDENCE § 2192, at 70 (McNaughten rev. 1961).

19. We note that in response to the prosecutor's questioning, Stewart said that he was probably at 1412 Chapin Street with the other govern-

the prosecutor called the defendant's accomplice, who had been tried separately, as a hostile witness. The accomplice asserted a Fifth Amendment privilege. Then, under "the guise of cross-examination to refresh [his] recollection," *id.* at 416, 85 S.Ct. at 1075, the prosecutor read the accomplice's confession in which he implicated both himself and the defendant. The Supreme Court held that this procedure violated the defendant's Sixth Amendment rights. *Id.* at 419–420, 85 S.Ct. at 1077–1078. The Court based this conclusion in part on the fact that the accomplice's "statement that the [defendant] fired the shotgun constituted the only direct evidence that he had done so," *id.* at 419, 85 S.Ct. at 1077, and that the confession as a whole "clearly bore on a fundamental part of the State's case against [the defendant]." *Id.* at 420, 85 S.Ct. at 1077. In the present case the eight leading questions certainly did not constitute "the only direct evidence" against appellant in the Chapin Street robbery; three other witnesses testified to appellant's involvement. This case is therefore unlike *Douglas,* in that any "prejudice in the denial of the right of cross-examination constituted a mere minor lapse." *Id.; see also Burkley v. United States,* 373 A.2d 878, 880 (D.C.1977). The circumstances here are not "such that 'inferences from [the] witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.' " *Douglas v. Alabama, supra,* 380 U.S. at 420, 85 S.Ct. at 1077 (citations omitted). This is simply not a *Douglas*-type case.

■ 3. The heart of appellant's claim of misconduct is that the prosecutor improperly asked eight leading questions

ment witnesses at the time of the robbery and that he knew Officer Griffin, one of the arresting officers. Lee testified to the same effect and also said that he had not been selling drugs at that location on May 22. This testimony indicates that both witnesses did remember at least some of the events they claimed to have forgotten.

while examining Stewart and Lee which put certain disputed facts before the jury. We agree with appellant and the trial court that these eight questions were improper. By asking them, the prosecutor suggested what Stewart's and Lee's testimony would have been if only they could remember what happened. This she had no right to do. *See, e.g., Hawthorne v. United States, supra* note 16, 476 A.2d at 171. Having determined that the prosecutor's actions were improper, "viewing [her actions] in context, we must consider the gravity of the misconduct, their direct relationship to the issue of guilt, the effect of specific corrective instructions by the trial court, and the strength of the government's case." *Hammill v. United States,* 498 A.2d 551, 554 (D.C.1985). In other words, we must determine whether there was substantial prejudice, as that term has been defined in *Gaither v. United States, supra,* and the long line of cases that have followed *Gaither,* of which *Hammill* is one of the most recent.

█ The prosecutor asked each of the witnesses whether property was taken from him on May 22, whether he made a report to the police on that date, and whether he remembered identifying appellant to the police. This misconduct inherent in these questions is not minor; through them the prosecutor was placing unreliable evidence before the jury. At least one question allowed the members of the jury to hear a fact not otherwise known to them, since no evidence had been introduced to show that either witness had identified appellant as the robber. The questions were directly relevant to the main issue in the Chapin Street case: whether appellant robbed Stewart and Lee, along with others, at gunpoint.[20] On the other hand, much of the substance of the leading questions was cumulative of evidence al-

ready before the jury, a fact which lessens both the gravity of the misconduct and the resulting prejudice. Showell and Shaw had previously testified that property was taken from Stewart and Lee. Officer Michael Mulderig had testified that both men told him on May 22 that they had been robbed.

█ At the beginning of the trial, the court instructed the jury to disregard any questions and answers to which an objection had been sustained. Then, in its final charge, the court directed the jury to "consider only that evidence which has been properly admitted in the case" and cautioned that "[q]uestions asked by counsel are not evidence." These limiting instructions were sufficient to protect appellant's constitutional rights. *See Frazier v. Cupp,* 394 U.S. 731, 735–736, 89 S.Ct. 1420, 1422–1423, 22 L.Ed.2d 684 (1969). Finally, the government's case against appellant with respect to the Chapin Street robbery was strong. Three witnesses (Shaw, Showell, and Cheseman) testified that appellant and his accomplice robbed and assaulted a group of people at gunpoint. Two police officers testified, without objection, that they were called to the scene and were told by the victims that a robbery had occurred. Given this evidence, we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States, supra,* 328 U.S. at 765, 66 S.Ct. at 1248.

*Stewart v. United States,* 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961), does not compel a different conclusion. In *Stewart* the prosecutor, while cross-examining the defendant in the third trial of a case, asked, "This is the first time you have gone on the stand, isn't it, Willie?" Because this question revealed to the jury that the defendant

---

**20.** It must also be noted, however, that the unanswered questions may well have aided the defense. Stewart and Lee failed to corroborate the other evidence that a robbery had occurred. Furthermore, appellant's version of the events of that night was that he was attacked by these

men after a drug transaction had gone awry. Any indication that the witnesses' loss of memory was not genuine would be consistent with a desire on their part to avoid testifying because they were the drug dealers who had allegedly assaulted appellant.

had failed to testify previously, the Supreme Court reversed his conviction on the ground that the question was an impermissible comment on the defendant's exercise of his right not to testify at his two earlier trials. *Id.* at 9–10, 81 S.Ct. at 945–946; *see Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The instant case does not present similar constitutional issues. Furthermore, the trial court in *Stewart* overruled defense objections to the impermissible questions and left the jury to draw the improper inferences; in this case, however, the objections were sustained.

■ 4. Appellant contends that the prosecutor compounded her misconduct when, in her closing argument, she urged the jury to bring its "knowledge of the street" to its consideration of the case and commented that, "for reasons of their own," Lee and Stewart "testified repeatedly they did not remember" the events of May 22.[21] Although we think these remarks were better left unsaid, we find no basis for reversal.

Any suggestion that the jury should rely on its "knowledge of the street" comes dangerously close to arguing facts not in evidence. If we were convinced that this was what the prosecutor did, reversal might well be warranted. In context, however, her use of this phrase appears to have had a different purpose, namely, to remind the jurors to use their common sense in assessing the credibility of each witness. We say "appears" because the reference to "knowledge of the street" immediately followed the equally dubious re-

mark that Lee and Stewart testified as they did "for reasons of their own." Appellant argues that these two comments, read together, suggested to the jury that fear of appellant prompted Lee and Stewart to suffer a false loss of memory.[22] We agree that the juxtaposition of the two phrases raises at least a cloud of ambiguity, but we are not persuaded that appellant's reading is the only correct one.

In resolving this issue, we are guided by the Supreme Court's decision in *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). That case laid down the rule that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Id.* at 647, 94 S.Ct. at 1873. We will not ascribe the worst possible meaning to an ambiguous remark by counsel unless counsel's intent to convey that meaning is a lot clearer than it is on this record. We note also that the prosecutor did not rely in any way on Stewart's or Lee's testimony in urging the jury to find appellant guilty; after mentioning that "for reasons of their own" they said they did not remember what had happened, she moved on to another topic.[23] Therefore, on the authority of *Donnelly,* we decline to find misconduct in the prosecutor's closing argument.

### C. *Detective Raffety's Testimony*

Appellant also argues that the prosecutor knowingly elicited from Detective Raffety identification testimony that had been

---

**21.** The prosecutor said to the jury:

Now, in addition we had two witnesses, Mr. Lee and Mr. Tyrone Stewart who for reasons of their own ... testified repeatedly they did not remember.

But we have more than them, and it will be up to you to bring your knowledge of the street, to bring your common sense, as I stated at the beginning, and to evaluate each witness' testimony. It will be up to you to determine the credibility of each witness that has testified.

She then turned her attention to the testimony of Catherine Shaw and Mona Lisa Showell.

**22.** The prosecutor made another reference to the jurors' "street knowledge" when she suggested that appellant had gotten rid of his guns and the proceeds of the second robbery before he was arrested. This remark was unrelated to the testimony of Stewart and Lee.

**23.** For this reason (and others as well), the instant case is distinguishable from *Bowler v. United States,* 480 A.2d 678 (D.C.1984).

previously suppressed. While we cannot attribute a bad motive to the prosecutor in this instance, her conduct certainly enabled the jury to hear the suppressed testimony. We are satisfied, however, that the jury's verdict was not tainted by this incident.

Earlier in the proceedings, the trial court had ruled that Detective Raffety could not testify as to any identifications made by witnesses, such as Maurice Lee, who had not themselves testified about identifications they had made. Immediately before Detective Raffety testified, the trial court asked the prosecutor whether she had instructed him not to reveal any such out-of-court identifications; the prosecutor replied that she had done so. Nevertheless, during her direct examination of Raffety, the following occurred:

Q. After learning more about the robbery what did you do, if anything?

A. I took a color photograph of the Defendant, Mr. Arnold, and I put together a photo spread because some of the people had not made an on-the-scene identification. I put together the photo spread and brought it out, and I brought out Maurice Lee.

Q. Sir—

At this point defense counsel interrupted with an objection, which the court sustained. At the bench conference which immediately followed, the court roundly castigated the prosecutor, saying, "This is unforgivable.... Why do you even ask those questions? ... There is just no excuse for this at all." Nevertheless, the court concluded that appellant had not been unduly prejudiced and denied defense counsel's motion for a mistrial.

■■■ We accept the prosecutor's representation that she had cautioned Detective Raffety not to say anything about Lee's identification of appellant. Nevertheless,

her open-ended question did allow the jury to hear Raffety's testimony. As the trial court pointed out, the prosecutor was the one who created a problem by connecting the creation of the photographic array with the detective's discussions with the Chapin Street witnesses. At the very least, when Detective Raffety started testifying about the on-the-scene identification and the photographic array, the prosecutor should have interrupted him. The government's suggestion that the prosecutor was merely proceeding in chronological order—from Raffety's discussions with the Chapin Street witnesses to his exhibition of a photographic spread to the Connecticut Avenue witnesses—must be rejected. The showing of photographs to the Connecticut Avenue witnesses occurred more than twelve hours after Detective Raffety's discussions with the Chapin Street witnesses. Therefore, to the extent that the prosecutor failed to exercise caution in her examination, she injected error into the trial.

■■■ We are satisfied, however, "that the error did not rise 'to the level of serious misconduct which reasonably could be viewed as having swayed the jury.'" *Hammill v. United States, supra,* 498 A.2d at 555 (citation omitted). Raffety did not actually testify that Lee had made an identification.[24] Even if Raffety had so testified, however, appellant could not have been significantly prejudiced because his defense to the Chapin Street incident did not rest on a claim of misidentification. Rather, he asserted that the incident was not a robbery at all, but a drug-related assault in which he was an innocent victim. We therefore conclude that if there was any prejudice flowing from the prosecutor's question and Raffety's answer, it was ephemeral and cannot now provide any basis for reversal.[25]

---

**24.** He said only that he "put together the photo spread and ... brought out Maurice Lee."

**25.** Appellant also argues that the cumulative effect of the misconduct concerning Brickel's identification testimony, Stewart's and Lee's testimony, and Raffety's testimony requires reversal because all three incidents, taken together, bolstered a weak case against him. We do not

agree that the case was weak. Moreover, since we conclude that the incidents of which appellant complains either did not amount to misconduct or did not result in substantial prejudice, we decline to base a reversal on the cumulative effect of the three incidents.

## IV

Appellant contends that the prosecutor impermissibly made a missing witness argument. We hold that the prosecutor's argument was improper in one respect, but that her transgression was harmless.

Appellant presented an alibi defense to the Connecticut Avenue charges through the testimony of his girl friend and her sister. They testified that appellant was at a party with several other people at the time of the Connecticut Avenue robbery. During her rebuttal argument to the jury, without ever asking the court's permission to make a missing witness argument, the prosecutor said:

Who has a motive not to tell the truth in this case? A strong motivating factor is love and friendship. And [the] only love and friendship in this case is on the part of the two witnesses for the defense.

Now, I believe the defense's evidence is on May 21, there was a house party, depending on who you believe. Ms. Leysath or Ms. White, who are sisters. On May 21 there was a house party. There were loads of witnesses, loads of witnesses at this house party. One witness said there [were] ten. Another witness says there [were] fifteen—lots of people there.

The defense in this first case is alibi. He is saying at 2:40 I was at this house party. That is the evidence presented by the defense. And out of those ten, fifteen people we get a girl friend—

Defense counsel objected at this point. Her objection was sustained, but her request for a cautionary instruction was denied. The prosecutor then resumed her argument, saying, "We hear from a girl friend, Ms. White." Defense counsel objected again, and the court sustained the objection, admonishing the prosecutor, "Abandon that line of argument." At the conclusion of the closing arguments, defense counsel again asked for a corrective instruction, but the court refused to give it.

In *Graves v. United States*, 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893), the Supreme Court announced the rule that "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates [an inference] that the testimony, if produced, would be unfavorable." *Id.* at 121, 12 S.Ct. at 41 (citations omitted). Before the jury may be asked to draw this inference, however, the court must determine "that the witness [is] able to 'elucidate the transaction' such that he might be expected to be called, and that he [is] 'peculiarly available' to the party against whom the inference is made." *Thomas v. United States*, 447 A.2d 52, 57 (D.C.1982). Furthermore, in the District of Columbia an attorney must seek permission to make a missing witness argument before making it, so that the court may determine whether the two conditions are met. *Parks v. United States*, 451 A.2d 591, 614 (D.C.1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983); *Thomas v. United States, supra*, 447 A.2d at 58; *Dent v. United States*, 404 A.2d 165, 169–170 (D.C.1979); *Givens v. United States*, 385 A.2d 24, 27 (D.C.1978); *Gass v. United States*, 135 U.S.App.D.C. 11, 19, 416 F.2d 767, 775 (1969). If either one is not, then neither a missing witness argument nor a missing witness instruction may be given. *Dent v. United States, supra*, 404 A.2d at 170; *Conyers v. United States*, 309 A.2d 309, 312–313 (D.C.1973). The courts have established these requirements to eliminate the risk that a missing witness argument "may add a fictitious weight to one side or another of the case [because] in a sense [it] creates evidence from the absence of evidence...." *Burgess v. United States*, 142 U.S.App.D.C. 198, 206, 440 F.2d 226, 234 (1970).

The prosecutor's comments in this case were what we have sometimes called a "partial" or "incomplete" missing witness argument. In such an argument, counsel

merely notes the absence of a witness but refrains from asking the jury to infer that the witness' testimony would have been adverse to the other party. *See Parks, supra,* 451 A.2d at 614; *United States v. Young,* 150 U.S.App.D.C. 98, 107 n. 16, 463 F.2d 934, 943 n. 16 (1972).

Our cases have never explicitly stated whether counsel should request permission to make an incomplete missing witness argument; indeed, the cases give conflicting signals. *Compare Fleming v. United States,* 310 A.2d 214, 220 (D.C.1973) ("If in this brief reference to appellant's inability to produce the witnesses error was committed, it was procedural error in failing to follow the *Gass* procedure"); *Parks, supra,* 451 A.2d at 614 ("The prosecutor's failure to seek court permission for a 'missing witness' argument here, however, did not constitute grave misconduct since he commented on Rositta Ross's absence but 'did not directly urge the jury to draw from the fact [of absence] an inference adverse to appellant' " (citation omitted)); and *Conyers, supra,* 309 A.2d at 313 ("While it is obvious that the prosecutor here erroneously failed to follow the *Gass* procedure ... this error was rendered harmless" by a curative instruction), *with Logan v. United States,* 489 A.2d 485, 490 (D.C.1985) ("no misconduct occurs when, as here, the prosecutor comments on a witness' absence but does not 'directly urge the jury to draw from the fact [of absence] an inference adverse to appellant' " (citation omitted)); and *Harvey v. United States,* 395 A.2d 92, 98 (D.C.1978) (no reversible error because the prosecutor "did not go the additional step ... to suggest that the absence of the book [witness] implied guilt on the part of the defendant"), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979). Similar uncertainty is found in the case law from our federal appellate court. *Compare United States v. Young, supra,* 150 U.S.App.D.C. at 107, 463 F.2d at 943, *with Burgess v. United States, supra,* 142 U.S. App.D.C. at 207, 440 F.2d at 235. In the case at bar, however, we are squarely presented with this issue, and we must decide it.

▇▇▇▇ A lawyer who makes an incomplete missing witness argument "is, ordinarily at least, in fact arguing to the jury that they may conclude that the testimony of these witnesses would be adverse to the party who failed to call them." *United States v. Young, supra,* 150 U.S.App.D.C. at 107 n. 16, 463 F.2d at 943 n. 16; *see Conyers, supra,* 309 A.2d at 313. We therefore hold that a lawyer proposing to make such an argument, even if it goes no further than to note the absence of the witness, should first obtain permission from the court to do so in order to avoid injecting prejudicial error into the trial. *See United States v. Young, supra,* 150 U.S.App.D.C. at 107, 463 F.2d at 943. In this way the court can "ensure that the foundational issues are addressed *before* possibly improper inferences are suggested to the jury." *Thomas, supra,* 447 A.2d at 58 (emphasis in original). In this case, because the law was uncertain, we cannot fault the prosecutor for failing to seek permission in advance to make an incomplete missing witness argument. But when she continued to make the argument after an objection to it had been sustained, she acted improperly.

▇▇▇▇ Nevertheless, we are satisfied that the jury's verdict "was not substantially swayed by the error." *Kotteakos v. United States, supra,* 328 U.S. at 765, 66 S.Ct. at 1248. "[R]epetition is an important factor in determining the gravity of such misconduct...." *Parks, supra,* 451 A.2d at 614 (citations omitted). In this case, the statements we have quoted were the prosecutor's only references, direct or indirect, to missing witnesses. The trial court sustained an objection to the prosecutor's remarks and specifically admonished her to "abandon that line of argument." This prompt and forceful intervention by the court mitigated the possibility of prejudice. *Smith v. United States,* 119 U.S.App.D.C. 22, 23, 336 F.2d 941, 942 (1964). "[M]oreover, 'no missing witness instruction [was]

given by the trial court to compound the effect of the prosecutor's comments' ... by lending them 'the weight of law.' " *Parks, supra,* 451 A.2d at 615 (citations omitted). Finally, as to the Connecticut Avenue incident, the evidence against appellant was quite strong. He had the proceeds of the robbery on him when he was arrested an hour later, and he was identified by one of the victims of the robbery, Peter Stein. Thus we conclude that the prosecutor's partial missing witness argument had no appreciable effect on the verdict.

## V

■ Appellant's last contention is that the trial court abused its discretion by denying his request for an individual poll of the jurors as to the separate counts relating to the Chapin Street robbery. We hold that there was no abuse of discretion in the manner in which the jurors were polled.

Twelve counts were submitted to the jury for its consideration. The first four were based on the Connecticut Avenue robbery, and the last eight on the Chapin Street robbery. Jury deliberations began at 3:00 p.m. on a Monday. At 4:25 p.m. the court received a note from one of the jurors which said:

> I cannot agree with fellow jurors in my feelings that the defendant is guilty of robbery of incident # 2.

Both the individual juror and the forewoman had signed the note. Deliberations continued while the court and counsel had a conference to discuss what action to take. Then, at 5:10 p.m., the court excused the jury for the day with instructions to return the next day and continue deliberating. On Tuesday morning, ten minutes after the court told the jury to resume its deliberations, the jury sent a note saying that it had reached a verdict.

After receiving the verdict as to the first robbery, the court turned to the second robbery. The forewoman delivered individual verdicts on each of the eight counts, followed by a joint affirmation as to each count by the jury as a whole. Defense counsel then requested an individual poll of each juror on each count relating to the Chapin Street incident. The court refused the request and instead had the jurors individually polled as to whether they agreed with the announced verdict as to all of the last eight counts. Each juror declared his or her agreement with that verdict. Appellant now contends that the trial court's refusal to poll the jurors individually as to each of the last eight counts was an abuse of discretion "because of the complexity and variety of the charges relating to the second incident and because of the danger of coercion evidenced by the note."

The purpose of a jury poll is to ensure that no juror has been coerced or induced to join in a verdict to which that juror does not fully assent, *Humphries v. District of Columbia,* 174 U.S. 190, 194, 19 S.Ct. 637, 638, 43 L.Ed. 944 (1899), and to eliminate any uncertainty as to the verdict announced by the foreman or forewoman. *United States v. Mathis,* 175 U.S.App.D.C. 341, 345, 535 F.2d 1303, 1307 (1976). "The trial court has substantial discretion to decide how the jury should be polled." *United States v. Mangieri,* 224 U.S.App.D.C. 295, 307, 694 F.2d 1270, 1282 (1982) (citation omitted). In this case the trial court ensured that no coercion or confusion occurred in the jurors' assent to the verdict. All the jurors, in unison, stated their agreement with the verdict, count by count, as it was announced by the forewoman. Then each juror was individually asked whether he or she agreed with the announced verdict as to the Chapin Street incident. Each juror thus had an opportunity to express any reservations about the announced verdict, both as to each count and as to each incident, but none did so. We believe that the procedure followed here was sufficient to serve the purposes of a jury poll and that the trial court had no obligation to do anything more. We find no abuse of discretion.

*Affirmed.*

NEBEKER, Associate Judge, concurring:

I concur in the result reached by my colleagues but not in the harsh character-

izations of the prosecutor's conduct. *See Powell v. United States*, 458 A.2d 412 (D.C.1983), my separate statement. In addition, I cannot agree with the holding of predicate error on the so-called "incomplete missing witness argument" of the prosecutor in Part IV. Given our holding that the "error" was harmless, I see no more reason that "we must decide it" here than there was occasion to "decide it" in our earlier cases. It would seem that my colleagues simply want to decide that the prosecutor must play the child's game of "Mother, May I" before making the observation that the defense has not presented all of the witnesses. My colleagues assume that something is "wrong" with a mention of the obvious fact that someone is missing. I doubt that assumption,[1] but in any event, they fail to give any guidance on what the trial judge should consider in granting or denying a request to make the argument. That much they owe the trial judges. I would leave it to counsel to argue whether the jury should infer anything from the unexplained absence of a knowledgeable witness.

1. Certainly, inferences can be drawn from absence of evidence. *Graves v. United States*, 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893). And in my view the contrary observation is not very well thought out. *Burgess v. United States*, 142 U.S.App.D.C. 198, 440 F.2d 226 (1970).