**Willie K. BEAN, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 88–1060.

District of Columbia Court of Appeals.

Argued March 15, 1990.
Decided May 31, 1990.

George A. Fisher, Washington, D.C., appointed by this court, for appellant.

Mary B. Murphy, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Jr., and Elizabeth Trosman, Washington, D.C., Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, NEWMAN and TERRY, Associate Judges.

NEWMAN, Associate Judge:

One and one do not, as the government contends, always make two; when it comes to counting the number of criminal offenses contained within a single transaction, only the legislature is capable of that kind of addition.

Willie K. Bean appeals his conviction on two counts of violating D.C.Code § 22–3204 (1989 Repl.), one for carrying a knife and the other for carrying a sawed-off .22 calibre rifle. Although we find no merit in any of the issues raised by Bean in his appeal, we do find merit in an issue raised *sua sponte* by this court: that Bean's conduct constituted a single violation of the statute and, thus, he may only be sentenced on a single count. We remand with instructions to vacate one of the two convictions and resentence on the other, leaving to the trial court the choice of which conviction to vacate. *Thorne v. United States*, 471 A.2d 247, 249 (D.C.1984). *See also United States v. Knight*, 166 U.S.App. D.C. 21, 30, 509 F.2d 354, 363 (1974).

I

According to the testimony of Officer Leonard Chappell of the Metropolitan Police Department, at about 9:45 p.m. on February 10, 1988, he was working a narcotics detail in the 3500 block of A Street, S.E., when he heard a radio broadcast that shots had been fired two blocks away in the 200 block of 37th Place, S.E. The broadcast stated that eyewitnesses had identified the shooter as Willie Bean, and gave a description of the car he was driving.

Chappell knew Bean from having arrested him some forty days earlier for assault with intent to kill.[1] Chappell also knew where Bean lived. Prior to checking Bean's residence, Chappell stopped at the crime scene and spoke to witnesses, who confirmed that Bean was the shooter. One witness also described the car Bean was driving. Chappell testified that he did not know the names of the witnesses to whom he spoke. Noting that the witnesses were "reluctant" to give their names, Chappell testified that he nonetheless knew them "by sight."

---

1. According to Chappell, in this earlier incident Bean had been armed with a .357 Magnum. Bean had shot his victim through an open window. The victim identified Bean as his attacker, and Bean was arrested pursuant to a warrant.

Chappell left the crime scene and headed for Bean's residence. On the way, he stopped at a red light at Minnesota Avenue and B Street, which was about one-and-one-half blocks from where Chappell knew Bean to reside. There Chappell observed a brown Chevrolet with paper tags backing up to the curb; the car answered the description of the car Bean was driving. Chappell estimated that he was some 65 feet away; he described the lighting conditions as "sodium vapor ... [h]igh intensity crime lights." He then saw Bean step from the car, bearing a long, cylindrical object in his hand. Chappell was unable to identify the object. He then saw Bean walk to the rear of the car and place the object in the trunk.

Chappell, who was uniformed and driving a marked cruiser, came through the intersection towards Bean. Bean saw him coming and ran; as he ran, he threw a set of keys over his shoulder. The keys hit the wall of an apartment building and slid to the ground. Chappell, knowing Bean's "propensity to be armed," drew his service shotgun and ordered Bean to stop. Bean did so and, on his own, assumed a prone position. At that point other officers arrived. Bean remained in his prone position.

Chappell retrieved the keys he had seen Bean discard and took them to the brown Chevy. When he reached the Chevy, he looked through the window and saw a "large, folding, locking blade knife" lying in plain view on the passenger seat. He then returned to the still-prone Bean and placed him under arrest for possession of the knife. Because he wanted to ascertain whether the long, cylindrical object he had seen Bean place in the trunk of the car was the weapon used in the shooting described by the witnesses he had spoken with, Chappell next went to the trunk of the car and opened it. There, without conducting a search of the contents, he observed the butt of a sawed-off .22 calibre rifle protruding from beneath the spare tire.

At trial, Bean's common-law wife, Sharon Carrington, testified for the defense. She stated that she owned a 1976 Gold Chevy Monte Carlo and that, several days after purchasing the car, she opened its trunk for the first time and saw the object identified by the government as the butt of a .22 calibre rifle sticking out from under the spare tire. Carrington testified that Bean had access to the car, but later testified that she had the only set of keys to it. She further testified that she had parked the car near the intersection of Minnesota Avenue and B Street S.E., which was around the corner from her house, sometime after 5:00 p.m. on the day Bean was arrested. Finally, she stated that Bean had been working on his car in front of her house from 5:00 p.m. until 9:35 p.m., at which time he took a shower before walking to the store.

Bean was convicted of two counts of violating § 22–3204, one for carrying the knife and one for carrying the gun. This appeal followed.[2] At oral argument, the court raised, *sua sponte*, the issue of whether Bean's conviction for two counts of carrying a dangerous weapon violated the doctrine established in *Cormier v. United States*, 137 A.2d 212 (D.C.1957), which held that a defendant carrying two unlicensed pistols was guilty of only one count of violating § 22–3204. This court requested that counsel submit supplemental briefs on this issue. They did so.

## II

D.C.Code § 22–3204 provides in relevant part as follows:

No person shall within the District of Columbia carry either openly or concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a

2. In his appeal, Bean challenged his convictions on grounds of (1) lack of probable cause in the search conducted by Officer Chappell; (2) the introduction of "other crimes" evidence in the portion of Officer Chappell's testimony in which he said he was able to identify Bean due to a previous "official" encounter; (3) abuse of discretion by the trial court in denying Bean's request for new counsel; and (4) denial of an impartial jury by failure to excuse a juror whose sons had been assaulted by a person with a knife on the night before deliberations began. We find no merit in these challenges.

pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon capable of being so concealed.

(1989 Repl.).[3]

In *Cormier v. United States, supra*, 137 A.2d 212, we held that a defendant who had simultaneously carried two unlicensed pistols in violation of D.C.Code § 22–3204 had committed a single offense and, thus, could not be given consecutive sentences based on two separate counts, one for each pistol. In reaching this conclusion, we relied on the United States Supreme Court's decision in *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), in which the Court held that a defendant who had transported two women in violation of the Mann Act[4] had committed but a single offense, and a Sixth Circuit opinion following *Bell, Rayborn v. United States*, 234 F.2d 368, 371 (6th Cir.1956), in which the court held that a defendant accused of transporting a load of weapons on a single trip in violation of the Federal Firearms Act[5] had committed a single violation and could not be convicted of a separate offense based on the transportation of each weapon.

The decision in *Bell* rested upon the principle that although persuasive arguments might be made to support the position that criminal liability should attach to each woman illegally transported by the defendant, in the absence of a clear expression of Congressional intent in the words of the statute "to make each stick in [the] faggot a single criminal unit," 349 U.S. at 83, 75 S.Ct. at 622, any doubts "will be resolved against turning a single transaction into multiple offenses...." *Id.* at 84, 75 S.Ct. at 622. The *Cormier* court concluded that the same principle applied to violations of § 22–3204, saw no clear expression of Congressional intent in the language of § 22–3204 to define the unit of prosecution as each individual weapon illegally carried,

and reversed one of Cormier's convictions. 137 A.2d at 217.

The government attempts to distinguish *Cormier* on its facts. As the government reads § 22–3204, the statute has two prongs: carrying an unlicensed pistol and carrying any deadly or dangerous weapon. In the government's view, *Cormier*, which dealt with a defendant charged with carrying unlicensed pistols, speaks only to the first prong of the statute, and thus only prohibits multiple convictions for carrying more than one unlicensed pistol. In support of its reading of *Cormier*, the government offers the following rationale: the statute requires any person who would carry a pistol to obtain a license, a license which the government represents is issued to individual persons and not with respect to individual pistols. Thus, failure to obtain *a* license is the root of the offense and not the number of pistols carried. But in this case, the government argues, the defendant is charged with violating the second prong of § 22–3204, carrying deadly or dangerous weapons. As the government points out, in order to violate the second prong, a person must carry a deadly or dangerous weapon capable of being concealed with the intent to use it as a deadly and dangerous weapon. *See, e.g., Clarke v. United States*, 256 A.2d 782 (D.C.1969); *Leftwich v. United States*, 251 A.2d 646 (D.C.1969). Thus, the government contends, the root of the violation is intent and, that being the case, conviction depends upon showing the requisite intent for each individual weapon so carried. Since intent must be shown as to each weapon, the government's argument concludes, it must follow that each weapon so carried constitutes a separate offense.

This argument is flawed, both legally and factually. The issuance of licenses to carry pistols is governed by D.C.Code § 22–3206, which provides in relevant part:

---

**3.** We note that since the elements of the two offenses Bean was convicted of are identical, a *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), analysis is inapposite here. *Blockburger* applies only where one offense requires proof of a different ele-

ment than the other. *See also Arnold v. United States,* 467 A.2d 136 (D.C.1983).

**4.** 36 Stat. 825 (1910), 18 U.S.C. § 2421.

**5.** 52 Stat. 1250 (1938), 15 U.S.C. § 902(e).

The Chief of Police of the District of Columbia may, upon application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year.

(1989 Repl.). Although the statute does refer to individual persons obtaining licenses, it also clearly states that licensed persons may carry *a* pistol. The government's brief does not direct us to the pistol licensing regulation in effect at the time Cormier was arrested and convicted nor to the one in effect at present. We have been unable to determine the existence or nonexistence of regulations at the time *Cormier* was decided. However, in view of the statutory language concerning the carrying of *a* pistol, it is not surprising to find that the *regulation currently governing the issuance of licenses* provides:

> Only one (1) weapon shall be carried pursuant to a license. The description and serial number of the weapon shall be part of the license. A new license shall be required for each different weapon carried.

24 DCMR § 2304.3 (1985).

The government's argument is further flawed since rather than distinguish *Cormier*, it simply avoids its *ratio decidendi:* in the absence of clear legislative intent,

any doubt as to whether a single statute creates a single or multiple offense "will be resolved against turning a single transaction into multiple offenses." *Bell, supra*, 349 U.S. at 84, 75 S.Ct. at 622.

The government attempts to address this latter flaw in its argument by citing this court's statement that in enacting § 22–3204 Congress intended to "drastically tighten the ban on carrying dangerous weapons." *Bruce v. United States*, 471 A.2d 1005, 1007 (D.C.1984). Since multiple liability is a more "drastic" penalty than single liability, the argument goes, Congress must have intended the former. Thus, without pointing to any clear expression of intent to create multiple liability in the language of the statute, the government concludes that the second clause of D.C.Code § 22–3204 (carrying a dangerous weapon) *should* allow multiple convictions where the government is able to demonstrate the carrying of different weapons.[6]

Whether or not § 22–3204 *should* allow multiple convictions, or even whether or not we think it should allow such convictions, is not at issue here. What is at issue is whether or not the legislature expressed a clear intention in the language of § 22–3204 that *does* allow multiple convictions. We see nothing in the relevant language of the statute, which we note remains unchanged in the 33–year–long wake of our decision in *Cormier* prohibiting multiple convictions, to indicate that such convictions are allowed.[7] Moreover, any Congressional intent to "drastically tighten the ban on carrying dangerous weapons" clear-

---

6. The government offers our decision in *Corbin v. United States*, 481 A.2d 1301 (D.C.1984), as instructive by analogy. In *Corbin* we upheld multiple convictions for possession of marijuana laced with PCP on grounds that the controlling statute, D.C.Code § 33–516(4), clearly stated that the admixture of PCP with "any material, compound, mixture, or preparation," even a non-prohibitive substance, was a criminal offense. However, no such analog of clarity of Congressional intent appears in the language of § 22–3204. *Cf. Briscoe v. United States*, 528 A.2d 1243 (D.C.1987) (reversing multiple convictions based on two separate stashes of marijuana found in two separate locations on the same occasion in the defendant's house on grounds that § 33–541 (1981 Repl.) does not clearly state

a legislative intention to permit multiple punishments; *e.g.* "Any person who violates this subsection with respect to [possession of marijuana] is guilty of a crime ...."; § 33–541(2)).

7. We reached the same conclusion in *Chapman v. United States*, 493 A.2d 1026, 1029 (D.C.1985). In its present form, § 22–3204 does allow for an enhanced form of punishment for repeat offenders and for those convicted of a felony in the District or elsewhere. However, the statute continues its long silence on the issue of whether multiple convictions are permitted for each pistol or weapon carried. D.C.Code § 22–3204 (1989 Repl.).

ly includes pistols; if such intent was not clear enough to make multiple offenses out of carrying multiple pistols in *Cormier*, then it is not clear enough to make multiple offenses out of carrying multiple weapons in this case.

In view of the principles established in *Bell* and applied in *Rayborn* and *Cormier*, we see no basis for making the great leap urged by the government from the general statement concerning Congressional ends contained in the phrase "drastically tighten the ban on carrying dangerous weapons" to the government's asserted means to those ends—multiple liability. The very purpose of the principle established in *Bell* and applied in *Cormier* is to prevent the transfer of the legislature's power to choose the means to its ends from the legislature to the executive by way of the judicial branch. As Justice Frankfurter, writing for the Court in *Bell*, put it:

> It is not to be denied that argumentative skill, as was shown at the Bar, could persuasively and not unreasonably reach either of the conflicting constructions. About only one aspect of the problem can one be dogmatic. When Congress has the will it has no difficulty in expressing it—when it has the will, that is, of defining what it desires to make the unit of prosecution and, more particularly, to make each stick in the faggot a single criminal unit. When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity. And this is not out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or antisocial conduct.

349 U.S. at 83, 75 S.Ct. at 622.

*Remanded for further proceedings consistent with this opinion.*