**Maurice W. MORRIS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 91–CF–1150.**

District of Columbia Court of Appeals.

Argued Feb. 11, 1993.
Decided March 30, 1993.

---

William S. Rhyne, McLean, VA, appointed by this court, for appellant.

Eric L. Yaffe, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman and Bruce Delaplaine, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and PRYOR, Senior Judge.

ROGERS, Chief Judge:

Appellant Maurice W. Morris appeals his convictions [1] by a jury on the grounds that

---

1. Appellant was indicted for attempted robbery while armed, D.C.Code §§ 22–2902 (Repl.1989), –3202 (Supp.1992), first degree murder while armed, *id.* §§ 22–2401 (Repl.1989), –3202 (Supp.1992), carrying a pistol without a license, *id.* § 22–3204(a), assault with intent to murder while armed (two counts), *id.* §§ 22–503, –2403 (Repl.1989), –3202 (Supp. 1992), and possession of a firearm during a crime of violence or dangerous offense, *id.* § 22–3204(b). The jury acquitted appellant of first degree murder while armed and assault

(1) the trial judge erred in allowing an improper missing witness argument and improper comment on appellant's post-arrest silence during cross-examination and closing argument, (2) the trial judge erred in refusing to admit evidence of other crimes committed by a third person, and (3) appellant's conviction for assault with a dangerous weapon merged with the conviction for attempted robbery while armed. We hold that the government did not make a missing witness argument, and we find no reversible error under the circumstances as a result of the prosecutor's reference to appellant's post-indictment failure to tell others who were present at the shooting to speak with law enforcement authorities. We also hold that the trial judge did not abuse his discretion in excluding certain evidence of the other crimes of a third person. Accordingly, except for a remand to address the merger of certain convictions, we affirm.

## I.

The grand jury returned a nine-count indictment charging appellant with crimes occurring on July 15, 1989. At trial, appellant presented a misidentification defense, admitting that he was at the crime scene but maintaining that the crimes were committed by Maurice Glenmore, who resembled appellant.

Vincent Flythe, the victim of the attempted robbery, testified that on July 15, 1989, he was standing on the corner of 12th and Hamlin Streets, N.E., when three or four masked "boys" ran around the corner, shooting in the air. One of the masked men ran up to Flythe, put a gun to Flythe's stomach, and pulled the trigger three times. Flythe saw sparks and heard a loud popping noise, but was not shot. Someone said, "give us your money." Flythe, claiming they were shooting blanks, told Tony Reed, who was using a public telephone

nearby, to run. Flythe ran in one direction and Tony Reed ran in another. Flythe heard Tony Reed scream, ran back, and saw Tony Reed lying on the ground. Tony Reed died later that night of four gunshot wounds.

An eyewitness, Octavia Brown, testified that on July 15, 1989, around 9:30 p.m., she was at 3006 12th Street, N.E. She heard gunshots coming from the direction of the corner of 12th and Hamlin. She looked out the window and saw Tony Reed and Antonio Brox running in one direction while Vincent Flythe ran in another. Three "boys" were shooting at the fleeing men. The "boys" were wearing ski masks, and Ms. Brown could see that two of them had guns and that the third held his hands as if he had a gun, although she could not see his gun. One of the masked men stopped in the middle of the street and "kept shooting" at Tony Reed and Antonio Brox, Tony Reed's cousin. Tony Reed fell to the ground as the shooter continued shooting at Tony Reed's brother, Randy Reed.

Ms. Brown explained that she was able to see the profiles of the two robbers when they removed their masks for about five seconds as Tony Reed was falling, that the masks were still off when Tony Reed's brother Randy arrived on the scene, and that the two men pulled their masks down again immediately when Randy Reed arrived.[2] She stated that "[i]t was light enough, [be]cause the streetlights were on," although the assailants were not standing under a streetlight. She described the shooter as having "[b]rown skin," with "big ears" and "big lips." The two assailants in the street were "shortish." One of the two assailants in the street pulled on the other one's shoulder, to signal him to leave. The third masked man, whom Ms. Brown described as the tallest of the three, was already running away.

with intent to murder Vincent Flythe, but found him guilty of second degree murder while armed, assault with a dangerous weapon (of Vincent Flythe), attempted robbery while armed (against Flythe), carrying a pistol without a license, and three counts of possession of a fire-

arm during a crime of violence (murder, assault on Flythe, and attempted robbery while armed).

2. During this time, the third masked man was further away from Ms. Brown, standing near the telephone booth close to the corner of 12th and Hamlin Streets.

Ms. Brown identified appellant in a photograph array about two days after the shooting and in a videotape of a lineup about two months thereafter. She also identified appellant in court as the shooter who had been standing in the middle of the street. In court, Ms. Brown was also shown photographs of appellant and Maurice Glenmore, who died in January 1990 and who appellant later argued was the real shooter. Ms. Brown admitted that the men in the two photographs looked similar, with big ears and prominent noses and lower lips. She claimed, however, that she could tell the two apart because one man had a darker complexion than the other.[3]

A second eyewitness, Randy Reed, was the brother of the deceased. He testified that while he was running an errand shortly before the shooting, he saw an old brown and yellow car on 10th Street, N.E., and that upon returning from his errand, he saw the same car again on the corner of 12th and Hamlin. While the car was stopped at a stop sign, Randy Reed saw five black males in the car, and he recognized three of them: Eric Forbes was driving the car, and Cary Jackson ("Mac") and appellant ("Mo Mo") were seated in the backseat. Reed left to run another errand, and when he returned, he was told that there was shooting going on. Randy Reed ran towards his brother Tony as Tony ran towards him.

Randy Reed saw someone standing in the middle of the street, almost directly in front of 3006 12th Street, shooting at his brother Tony Reed. He saw the shooter's face for approximately ten seconds, while standing about four or five car lengths away. He recognized the shooter as appellant, whom he knew as Mo Mo and had seen in the back seat of the brownish-yellow car. Randy Reed was positive that Mo Mo was the shooter; he had seen appellant approximately thirty to fifty times over the preceding year on the street and in clubs. Although he did not remember the robbers putting on or taking off masks, there was something on top of the shoot-er's head that the shooter pulled down over his face as he ran away. He identified appellant in court and from a videotaped lineup as the shooter. When shown a photograph of Maurice Glenmore, Randy Reed said that Glenmore did not look like appellant because of the former's "facial structures" and smaller head.

Appellant, whose nickname was Mo Mo and who was sixteen at the time of the shooting, testified that on the evening of July 15, 1989, two groups of friends switched cars and he drove off with one group in a tan car, intending to go to a club. Eric Forbes was driving the car, Rico Thomas was the front seat passenger, and appellant, Maurice Glenmore ("Mo"), and Cary Jackson were on the left, center, and right portions of the back seat, respectively. According to appellant, as they passed the corner of 12th and Hamlin Streets, N.E., Glenmore said, "[t]here's Vincent," and that he was going to rob Vincent Flythe to get money for the club's entrance fee. Forbes pulled the car into an alley, and everyone except Forbes got out of the car. Appellant testified that Glenmore, Jackson, and Thomas all had guns and that they put on black ski masks. Appellant saw Glenmore, Jackson, and Thomas walk toward the corner of 12th and Hamlin Streets, as appellant and Forbes waited with the car. Appellant heard shots, saw two people running, and saw Glenmore standing in the street, shooting at one of the running men. Glenmore, Jackson, and Thomas returned to the car and removed their masks. Appellant testified that he never intended to commit a robbery.

William Welch, a defense expert witness, testified that if the cartridge shells and the bullets found on the scene came from the same gun, the gun used was probably either a Stoeger Lueger or a Hi–Standard Sport King. However, he did not know whether the cartridge shells and bullets belonged together, and if not, he opined

---

**3.** Detective Randall testified that during the photograph array Ms. Brown had identified as the second robber a man who was deceased at the time of the shooting and attempted robbery. The detective also testified that he had never heard Glenmore mentioned as a suspect.

that approximately thirty-six types of guns could have fired the bullets.[4]

Appellant also called several friends who testified that they had seen Glenmore with a German Lueger on several occasions in June and July 1989. Indeed, Andy Williams testified that he had not only seen Glenmore with a German Lueger on several occasions in June and July of 1989, but he had actually seen Glenmore shoot someone with the gun. Nathanial Matthews testified that he, too, had seen Glenmore with a Lueger in June 1989, had seen him use the gun to shoot someone, and knew of robberies that Glenmore had committed. Matthews further testified that although he never had any trouble telling them apart because he knew them, appellant and Glenmore "looked just alike": they were the same size, and "the only difference" was that one had darker skin than the other.

Appellant's sister also testified that she and appellant's mother had once mistaken Glenmore for appellant for a few seconds.[5]

In rebuttal, Maurice Glenmore's aunt testified that appellant looked "nothing like" Glenmore because appellant was shorter and his "ears came outward," while Glenmore's did not.

## II.

Appellant contends that the trial judge erred in not intervening *sua sponte* when the prosecutor made a missing witness argument and commented on appellant's post-arrest silence while cross-examining appellant, and in overruling defense counsel's objection to a similar missing witness argument and comment on appellant's post-arrest silence during the prosecutor's closing argument.[6] After the prosecutor com-

---

4. Mr. Welch also testified that he had visited the crime scene at about 9 p.m. one night, almost two years later, and found that he could not easily discern the features of persons he knew from a distance of more than twenty-five feet.

5. To show that Randy Reed could not have seen the shooter's face—because the shooter turned and ran before Randy Reed arrived on the scene—the defense also called David Brox. Brox was Tony Reed's cousin and was at 3006 12th Street on the night of the shooting. Brox testified that he never saw the shooter remove his mask. (He described the mask as a light brown stocking cap which had a knot on top and was the type of mask which flattens facial features but still leaves the face visible.) When the shooter turned and ran, Brox could hear Randy Reed but he could not yet see him. Brox admitted, however, that he may have missed something while he was running up or down stairs.

6. During the prosecutor's cross-examination of appellant, the following exchange occurred:
 [THE PROSECUTOR:] After you got arrested did you ever talk to Eric Forbes?
 [APPELLANT:] No.
 [THE PROSECUTOR:] You never did?
 [APPELLANT:] No.
 [THE PROSECUTOR:] Did you ever try and get in touch with him?
 [APPELLANT:] No.
 [THE PROSECUTOR:] When you knew you were charged with the murder you didn't commit, right?
 [APPELLANT:] Yes.
 [THE PROSECUTOR:] And you knew Eric Forbes could tell the police you didn't do it, correct?
 [APPELLANT:] Yes.

 [THE PROSECUTOR:] You never tried to call Eric Forbes?.
 [APPELLANT:] No.
 [THE PROSECUTOR:] Rico Thomas, did you ever try to talk to him about it?
 [APPELLANT:] No.
 [THE PROSECUTOR:] Mac? [Cary Jackson]
 [APPELLANT:] No.
 In closing argument, the prosecutor told the jury:
 Then he's arrested, he's an innocent man and he's arrested. Now put yourself in his shoes. You didn't commit a crime, what are you going to do? Aren't you going to call up, does it take any great mind to figure out I'm going to call up Eric Forbes, my friend, Eric Forbes, I'm going to say, Eric, you were there, how about getting me out of this jam. See, I'm being charged with first degree murder and I don't like being in jail. It's not fun. How about calling—how about telling the police who really did the murder? How about calling up the prosecutor, Mr. Delaplaine, or the U.S. Attorney's office or anybody—
 Defense counsel objected, and asked to approach the bench, but the trial judge overruled the objection. The prosecutor continued:
 Does he do that, ladies and gentlemen? Does he call anybody up? He told you no, he didn't ask Eric Forbes to make any call for me. I didn't ask Carey Jackson, I didn't ask Rinko [sic] Thomas, I didn't ask any of those guys to say I didn't do it. That was his testimony, ladies and gentlemen.
 And is that what you would have done if you were an innocent man in his situation?

pleted his initial closing argument, defense counsel explained to the judge that her objection was based on the prosecutor's use of a missing witness argument (where the witnesses had a Fifth Amendment privilege) and on his comment on appellant's post-*Miranda*[7] silence in that appellant had failed, after he had acquired counsel, to contact witnesses and mount a defense. The judge ruled that he did not interpret the prosecutor's argument to be a missing witness argument but rather to be a comment on appellant's claims that Maurice Glenmore had threatened appellant when appellant was in jail.[8] The judge did not explicitly address defense counsel's claim that the prosecutor had impermissibly commented on appellant's silence. Appellant's motion for a mistrial was denied.

### A.

 It is clear under our recent case law that the prosecutor's cross-examination of appellant and comments during closing argument did not present a missing witness argument.[9] In *(Claude) Allen v. United States*, 603 A.2d 1219 (D.C.1992) (en banc), *cert. denied*, ─ U.S. ─, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992), the court drew a line between comment on a defendant's prearrest conduct and comment on a defendant's failure to call witnesses at trial to support his defense. *Id.* at 1223. The defendant in *Allen* argued that the prosecutor had made an impermissible missing witness argument when, in cross-examination and closing argument, the prosecutor commented on the defendant's failure to keep in touch with or learn the last name of a supposed witness to the crime. *Id.* at 1222.[10] The en banc court rejected arguments similar to those made by appellant in concluding that the prosecutor was not making a missing witness argument by commenting on Allen's prearrest failure to take steps that were consistent with his claim of self-defense. *Id.* at 1222–23. As in *Allen*, the prosecutor's questions in the instant case established that appellant, albeit after he was arrested, had not attempted to contact people who were present at the shooting, and the prosecutor's closing argument did not refer to the fact that those persons had failed to appear as witnesses at trial. *See id.* at 1222–23. *Compare Givens v. United States*, 385 A.2d 24, 25–27 (D.C.1978); *Harris, supra*, 602 A.2d at 157–58. Therefore, the prosecutor did not make an improper missing witness argument. *Allen, supra*, 603 A.2d at 1223. Moreover, contrary to appellant's contention, the record indicates that the prosecutor did not draw an adverse inference of consciousness of guilt from appellant's failure to call witnesses at trial, but rather drew an adverse inference on the plausibili-

7. *Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966).

8. The judge explained that the prosecutor "was rather commenting on the proposition that with all these guns, with all these other matters that [appellant] testified to, he chose to just merely be threatened by Glenmore.... [This was] a comment on the evidence."

9. *See generally Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893); *Arnold v. United States*, 511 A.2d 399, 415 (D.C. 1986) (citations omitted); *Lawson v. United States*, 514 A.2d 787, 789 (D.C.1986); *Harris v. United States*, 602 A.2d 154, 160–61 (D.C.1992) (en banc); *Gass v. United States*, 135 U.S.App. D.C. 11, 19, 416 F.2d 767, 775 (1969) (missing witness argument involves adverse inference from witness' absence at trial, where witnesses were peculiarly available to defense and their testimony would have "elucidate[d] the transaction") (citations omitted); *see also Arnold, supra*, 511 A.2d at 415–16 (partial missing witness argument is one in which counsel notes the absence of a witness but does not ask the jury to draw inference that witness' testimony would have been unfavorable to defendant) (citations omitted). Counsel must seek prior approval by the trial judge before using a missing witness argument. *Arnold, supra*, 511 A.2d at 415, 416 (complete or partial missing witness argument) (citations omitted); *see also Harris, supra*, 602 A.2d at 160–62 (trial court retains discretion to refuse to allow missing witness argument); *Gass, supra*, 135 U.S.App.D.C. at 19, 416 F.2d at 775.

10. In *Allen, supra*,
[d]uring cross-examination, the prosecutor sought to show that if Allen had killed Manning justifiably in self-defense, then it would have been logical for him to do what he could to enable the authorities to find out what really happened. Specifically, the prosecutor suggested that an innocent man would have ... requested Gerard to stay in touch.
*Id.* 603 A.2d at 1222–23.

ty of his misidentification defense in light of his post-arrest failure to contact acquaintances who were at the scene of the shooting.[11] See id. at 1222. Appellant's reliance on Lawson, supra, 514 A.2d at 793, 789, and Lemon v. United States, 564 A.2d 1368, 1374 (D.C.1989), is misplaced since in both cases the prosecutor specifically referred to the defendant's failure to call certain witnesses to testify at trial.

 We need not decide whether the prosecutor should have sought the trial judge's approval before asking these questions and presenting his argument to the jury if the prosecutor sought to draw an inference of consciousness of guilt from appellant's inaction.[12] Even if the prosecutor should have sought prior approval, we find no reversible error. See Allen, supra, 603 A.2d at 1223, 1225, 1227; cf. Arnold, supra, 511 A.2d at 416. The jury surely realized, even without the prosecutor's comments, that none of the other people whom appellant claimed had been in the car with him on the night of the shooting had testified at trial. See Lemon, supra, 564

A.2d at 1376; Harris, supra, 602 A.2d at 164; see also Allen, supra, 603 A.2d at 1227. The prosecutor used the offending line of questioning in only one part of his cross-examination of appellant and during only one part of his closing argument. See Allen, 603 A.2d at 1225–26; see also Parks v. United States, 451 A.2d 591, 614 (D.C. 1981), cert. denied, 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983); Arnold, supra, 511 A.2d at 416; Sherrod v. United States, 478 A.2d 644, 654 (D.C.1984). The government's case quite strongly showed that appellant was guilty of murder for "advising, inciting, or conniving at the offense, or aiding and abetting the principal" even if the jury believed that appellant did not personally pull the trigger.[13] See D.C.Code § 22–105 (Repl.1989).

## B.

 More problematic are the prosecutor's references during cross-examination and closing argument to appellant's post-arrest failure to reveal defense evidence to the authorities.[14] The cross-examination

---

**11.** In any event, appellant could have brought out on re-direct examination, and thereafter during closing argument, that the people in the car with him were either deceased or unlikely to contact authorities for fear of incriminating themselves. See Allen, supra, 603 A.2d at 1223 & n. 5. In his post-trial motion and in his brief on appeal, appellant states that Cary Jackson was dead and Rico Thomas was in hiding at the time of appellant's trial. Appellant offers no proof for these assertions, however, and does not state how soon after the shooting and appellant's arrest they became unavailable.

**12.** In Allen, supra, 603 A.2d at 1229–30, the prosecutor, acknowledging that he was coming close to a missing witness argument, obtained prior approval of the trial judge before arguing that the defendant should have maintained contact with a witness. See Allen, supra, 603 A.2d at 1229–30 (Rogers, C.J. and Ferren and Terry, J.J., concurring). Therefore, the Allen majority had no occasion to consider whether failure to seek prior approval of an inference from a defendant's inaction, even where there was no missing witness inference, would have been error. The concurring opinion concluded that inferences from inaction generally require prior approval from the trial judge. See id. at 1229, 1231–32. The concurring opinion also suggested that a trial judge faced with a proffer of evidence aimed at establishing a consciousness of guilt inference should use a three-pronged test to evaluate whether a reasonable jury could

reasonably find that the defendant's inaction was "inconsistent with the conduct of an innocent person." Id. at 1233 (three factors: whether an innocent person in the defendant's place would have (1) feared prosecution, (2) understood that the evidence would be important to a defense, and (3) believed that actions taken to gather that evidence would be necessary and not futile; if inference appropriate, the judge to determine whether the evidence was relevant and material, and whether its probative value was outweighed by its prejudicial effect).

**13.** Even though an improper missing witness inference that addresses the defendant's credibility, "where the defendant's credibility is a key issue, ... will ordinarily require reversal," Thomas v. United States, 447 A.2d 52, 59 (D.C. 1982), see also Lawson, supra, 514 A.2d at 793, that is not a hard and fast rule. See Allen, supra, 603 A.2d at 1227 (trust jury to use "common sense and good judgment ... and to base their verdict on the evidence"); Lemon, supra, 564 A.2d at 1376 (citations omitted). In any event, the instant case does not present a missing witness inference, but at most an inference of consciousness of guilt.

**14.** Neither appellant nor the government cites (William) Hill v. United States, 404 A.2d 525 (D.C.1979), cert. denied, 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980), or argues that

concerned appellant's conduct after his arrest, unlike the cross-examination concerning pre-arrest conduct in *Allen, supra,* 603 A.2d at 1222. Moreover, the questions on cross-examination concerning Eric Forbes implied that failure to contact him was tantamount to appellant's failure to exculpate himself (through Forbes) to the police. Appellant did not object to the cross-examination, however, and for the same reasons we find harmless error in the prosecutor's closing argument, discussed *infra,* the questionable cross-examination did not rise to the level of plain error.[15] *Hunter v. United States,* 606 A.2d 139, 143–144 (D.C. 1992) (citations omitted); *see also Harris, supra* note 9, 602 A.2d at 159 (citations omitted).

 The prosecutor's comments during closing argument were an impermissible reference to appellant's failure to reveal defense theories to the police or the prosecutor. In *Hunter, supra,* 606 A.2d at 143–44, which was decided after appellant's trial, the court made clear that a prosecutor may not seek to draw a negative inference about a defendant's credibility based on the defendant's post-indictment failure to "volunteer his [or her] account to the government."[16] Such an argument, the court pointed out, is not probative of appellant's credibility because silence in such circumstances is not inconsistent with innocence; on the other hand, there is great potential for undue prejudice. *Hunter, supra,* 606 A.2d at 143 (citations omitted); *cf. Doyle v. Ohio,* 426 U.S. 610, 616–17, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976). In the instant case, the prosecutor did not merely ask why appellant had not contacted the witnesses himself—as occurred in *Allen, supra,* 603 A.2d at 122–23. Rather, during closing argument the prosecutor rhetorically asked why appellant had not asked the witnesses to call the police or prosecutor to give the authorities information in support of appellant's claim of innocence.[17]

 The same rationale that forbids comments on a defendant's failure to "lay bare [her or his] defense for the prosecutor or the police," *Hunter, supra,* 606 A.2d at 143, applies to comments on a defendant's failure to reveal the same information by proxy, by asking others to contact the prosecutor. For obvious tactical reasons, indicted defendants—or a defendant in custody represented by counsel—may choose not to urge their witnesses to speak with the prosecutor, fearing that the latter would seek to freeze their statements in grand jury testimony for impeachment use at trial. *See Hunter, supra,* 606 A.2d at 143–44. Discovery in criminal trials, especially discovery of the defense case, is very limited because of the adversarial nature of

---

either the prosecutor's cross-examination or closing argument concerning appellant's failure to contact his friends was impermissible under *Hill's* doctrine of impeachment by prior inconsistent statement. We do not address the issue since the parties do not raise it.

**15.** The prosecutor's reference to appellant's failure to call the police immediately after the shooting was a comment on appellant's *pre-*arrest, pre-indictment silence, and appellant does not claim on appeal that those questions were erroneously allowed by the trial judge.

**16.** In *Hunter,* the prosecutor stated during closing argument: "Here's somebody charged in an indictment ..., which normally you would not take lightly.... And yet, he doesn't tell the Government, didn't tell the police, doesn't tell anybody, hey, you don't understand how this all came about." 606 A.2d at 142.

**17.** We agree with the government's reading of the prosecutor's statements in closing argument to mean that appellant did not ask Eric Forbes to call the police or prosecutor, not that appellant did not himself call the authorities. After defense counsel's objection was overruled, the prosecutor moved on in closing argument to ask the jury: "why doesn't he [appellant] tell anybody who really did the crime?" Appellant does not challenge this statement on appeal. Appellant contends, however, that the argument that appellant should have had acquaintances contact the police suggested that appellant had a burden of proof. We disagree. *See Gray v. United States,* 589 A.2d 912, 917–18 (D.C.1991); *McCowan v. United States,* 458 A.2d 1191, 1197 (D.C.1983); *Boyd v. United States,* 473 A.2d 828, 833–34 (D.C.1984) (citing *inter alia Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)). Appellant's reliance on *Price v. United States,* 531 A.2d 984, 990–92 (D.C.1987), is misplaced because that case concerned cross-examination that established that appellant knew of no reason why missing witnesses could not testify at trial.

criminal prosecutions. *See id.;* Super.Ct.Crim.R. 16(b). Comments on a defendant's failure to reveal information to a prosecutor might impair a defendant's right to a fair trial. *Id.* at 144 (jury does not realize that it is not wise for a defendant to reveal defense to prosecutor).[18] The trial judge, therefore, erred in overruling the defense objection to the prosecutor's remarks during closing argument on appellant's failure to ask others to speak with the police on his behalf.

■ The court has held that a prosecutor may cross-examine a defense witness concerning that witness' failure to bring information to the police or prosecutor where such questioning addresses the witness' credibility. *See Cain v. United States,* 532 A.2d 1001, 1005–06 (D.C.1987).[19] On the other hand, the court has also held that the prosecutor may not comment on the defendant's failure to contact the authorities personally or through counsel, *Hunter, supra,* 606 A.2d at 142–44, and we now hold that a prosecutor may not comment on the failure of a defendant represented by counsel to ask potential defense witnesses to contact the authorities on the defendant's behalf.

After indictment, a defendant's conduct may or may not be probative of guilt or innocence because what the defendant does may be determined by the defense strategy to be used in the adversarial system. *Cf. Doyle v. Ohio, supra,* 426 U.S. at 617, 96 S.Ct. at 2244. The prohibition stated in *Hunter* is meant to prevent the jury from drawing an improper inference that the defendant's actions or inactions stemmed from consciousness of guilt rather than from trial strategy. *See Hunter, supra,* 606 A.2d at 143; *cf. Allen, supra,* 603 A.2d at 1233. The same rationale does not apply to a witness's failure to give information to the police or the prosecutor. Witnesses are not entitled to all of the special protections given to a defendant, and, hence, comment on a witness' failure to give information to the authorities may be relevant to credibility without having the same prejudicial impact on the defendant's fate as a comment on a defendant's inaction.

■ The question remains whether the trial judge's error in overruling the defense objection to the government's closing argument was harmless.[20] *See Hunter, supra,* 606 A.2d at 144; *Allen, supra,* 603 A.2d at

18. The government's attempts to distinguish *Hunter* are unpersuasive. It is inaccurate to suggest that the prosecutor simply "focused on appellant's silence vis-a-vis his friends." The government's reliance on *Grancorvitz v. Franklin,* 890 F.2d 34 (7th Cir.1989), *cert. denied,* 495 U.S. 959, 110 S.Ct. 2566, 109 L.Ed.2d 749 (1990), is misplaced. In *Grancorvitz,* the court concluded that where a defendant claimed self-defense, the prosecutor did not infringe on the defendant's *Miranda* right to remain silent when the prosecutor's cross-examination and closing argument referred to the defendant's failures to tell the sheriff or anyone else while he was in jail of his injuries allegedly incurred while defending himself from the victim, and his failure to request medical attention. *Id.* at 41–43 & n. 11. But the court explained that "[t]here is a difference between refusing to speak about the facts of a case or explain one's role, if any, in the crime, and not asking for medical treatment or failing to complain of injuries. The right to remain silent in the face of accusations of illegal activity only includes the former." *Id.* at 42. *See also id.* at 43 ("what is impermissible is the government's inference that silence is inconsistent with innocence").

19. The court observed in *Cain,* however, that "in certain contexts, a prosecutor is precluded from

commenting upon or inquiring into the reasons underlying a witness' delay in coming forward with exculpatory evidence." *Id.* at 1006 (citation omitted).

20. The government argues that a plain error standard applies because the relevant portion of the prosecutor's closing argument was based on his cross-examination of appellant, and defense counsel failed to object to the questions on cross-examination. In fact, the closing argument went beyond the cross-examination by expanding on the idea that appellant also did not ask Eric Forbes to contact the authorities on appellant's behalf. The defense objected to the relevant part of the closing argument.

The government also mistakenly maintains that the plain error standard applies to the closing argument because defense counsel did not object on the grounds that the prosecutor had commented on appellant's failure to give defense information to the prosecutor. In fact, defense counsel stated that her objection to the closing argument rested on two grounds: use of an impermissible missing witness argument and use of an "argument that my client, at a time when he had counsel, could have called, contacted people, and at that time put forward a defense." Accordingly, we apply the harmless error standard.

1225; *see also Harris, supra,* 602 A.2d at 159; *cf. Singleton v. United States,* 488 A.2d 1365, 1369 (D.C.1985) (quoting *United States v. Hastings,* 461 U.S. 499, 511, 103 S.Ct. 1974, 1981–82, 76 L.Ed.2d 96 (1983)). The impermissible comment on appellant's post-arrest inaction occurred during the prosecutor's initial closing argument in which he reviewed at length the evidence presented by the government and the defense. He did not return to the impermissible comment during rebuttal closing argument. *Cf. Lemon, supra,* 564 A.2d at 1374 (repeated questioning on cross-examination). Thus, as in *Hunter, supra,* 606 A.2d at 146, the offending comment was a relatively brief reference during a "lengthy closing" argument.[21] Defense counsel had an opportunity to respond during closing argument. Furthermore, as previously noted, it must have been readily apparent to the jury that Rico Thomas, Eric Forbes, and Cary Jackson had not appeared to corroborate appellant's version of events and the jury undoubtedly understood as well, why, in their own self-interest, the three men would not have contacted law enforcement authorities on appellant's behalf. *Cf. Lemon, supra,* 564 A.2d at 1376. In addition, the prosecutor's comments did not go to "the heart of the defense," as in *Singleton, supra,* 488 A.2d at 1367, but addressed only appellant's failure to contact potential witnesses who were themselves implicated in the shooting.[22] As earlier noted, the government's case was strong, consisting of two eyewitnesses as well as appellant's admission that he was at the scene and knew that his companions, whose masks and guns he saw, planned to rob someone. Appellant presented his misidentification defense through the testimony of family and friends and by attacking the reliability of the eyewitnesses' identifications. *See* notes 3 & 5, *supra.* Specifically, his defense was that he was mistaken for Maurice Glenmore, but only appellant's testimony placed Glenmore at the scene, and Glenmore's culpability was not inconsistent with appellant's guilt as an aider and abettor. *See* note 29, *infra.* Under these circumstances, we conclude that the error was harmless.

### III.

Appellant also contends that the trial judge erred in refusing to admit evidence of other crimes committed by Maurice Glenmore.

Defense counsel proffered that the testimony of three witnesses would show that Glenmore had committed armed robberies with a Lueger in neighborhoods with which he was familiar, that Glenmore had shot someone from about the same distance that the shooter hit Tony Reed, and that Glenmore had shot Eric Forbes with a Lueger within three weeks after Tony Reed's murder. This evidence was designed to show that at the time Glenmore had committed the other crimes, he had the type of gun that killed Tony Reed, that Glenmore's motive on July 15, 1989, was robbery, and that Glenmore could hit a target from the distance that Tony Reed was shot. Evidence that Glenmore had shot Eric Forbes was designed to show Glenmore's consciousness of guilt; because Forbes was present at the scene of the shooting but he did not participate in it, he was a possible witness against Glenmore.

After each proffer the trial judge refused to admit the evidence, reasoning that *Drew v. United States,* 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964), applies

---

**21.** In *Hunter,* however, defense counsel did not object at trial to the prosecutor's closing argument, implying that counsel had not perceived any prejudice arising from the argument. *Hunter, supra,* 606 A.2d at 145 (citation omitted). The *Hunter* court was therefore reviewing for plain error only. *Id.* at 144.

**22.** In *Singleton,* the improper cross-examination concerning the defendant's post-arrest silence arose where the defendant claimed self-defense and the case was essentially a credibility contest between the defendant and the complainant; other witnesses had not observed the entire incident. 488 A.2d at 1369–70 ("[w]hen the prosecution uses post-*Miranda* silence ... to attack the heart of the defense, the error is unlikely to be harmless"). The court noted that the defendant's version was not inherently implausible, *id.* at 1370, and that the prosecutor's improper cross-examination focused on the defendant's failure to inform the police, after he had received his *Miranda* warnings, that he was acting in self-defense. *Id.* at 1369.

to evidence of other crimes committed by third parties as well as by defendants, that no *Drew* exception applied, and that the evidence was offered to show propensity, which "is not allowed." The judge also stated that "to the extent I might have any discretion at all because we are not talking about [other crimes of] a [d]efendant in a criminal case, ... I am exercising that discretion to conclude that propensity evidence is valueless in the context of this case just as it would be in the context of most other cases." This court's review is for abuse of discretion, *Beale v. United States,* 465 A.2d 796, 803 (D.C.1983) (citation omitted), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984); *Groves v. United States,* 564 A.2d 372, 374 (D.C.1989), *revised on rehearing,* 574 A.2d 265 (D.C.1990); *see also Willcher v. United States,* 408 A.2d 67, 75 (D.C.1979), and we find none.[23]

The court has not yet decided whether *Drew* may be used defensively, i.e, that it applies to defense evidence regarding third parties' crimes.[24] *See Gates v. United States,* 481 A.2d 120, 125 (D.C.1984); *Groves, supra,* 564 A.2d at 378 n. 15. We need not decide the issue here. Much of the proffered evidence was clearly inadmissible under the *Brown–Beale* test[25] but in evidence anyway.

■■■ Appellant's proffered evidence failed to show the necessary clear link between Glenmore's previous crimes and the crimes with which appellant was charged. Evidence that Glenmore had committed other armed robberies, even robberies in neighborhoods in which Glenmore was well-known, did not tend to show that Glenmore had committed the attempted robbery, murder, and related crimes that occurred on July 15, 1989. Mere opportunity is insufficient. *See Johnson, supra,* 552 A.2d at 518; *Shepard v. United States,* 538 A.2d 1115, 1117 (D.C.1988). Our decisions make clear that more is required.[26] The

**23.** *See Easton v. United States,* 533 A.2d 904, 908 (D.C.1987) (under *Drew* analysis, judge may exercise discretion, upon weighing the probative value and prejudicial effect, to exclude other crimes evidence otherwise admissible under *Drew*).

**24.** In its brief the government submits that "there is no principled difference between the government's attempt to introduce other crimes evidence against a defendant, and a defendant's attempt to introduce other crimes evidence against a third person."

**25.** *See Beale, supra,* 465 A.2d at 803 (defendant may present evidence tending to show that a third party committed the crime if the evidence has sufficient indicia of reliability and clearly links the third party to the crime); *(James) Brown v. United States,* 409 A.2d 1093, 1097 (D.C.1979) (same); *(Woredell) Johnson v. United States,* 552 A.2d 513, 516 (D.C.1989) ("[w]hat we mean by 'clearly link,' ... is proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense"; otherwise, the evidence is "too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt"). The trial judge must also weigh the evidence's probative value against its prejudicial impact. *Brown, supra,* 409 A.2d at 1097; *Johnson, supra,* 552 A.2d at 517 (citations omitted); *cf. Thompson v. United States,* 546 A.2d 414, 418–20 (D.C.1988) (other crimes evidence presumed inadmissible not be-

cause it is irrelevant, but because it is prejudicial and unduly persuasive).

**26.** *See Shepard, supra,* 538 A.2d at 116–17 (evidence that another man had purchased gas and walked in the direction of crime scene about forty minutes or an hour before a molotov cocktail was thrown "was not so clearly linked to the charged arson as to be probative of appellant's defense"); *Stack v. United States,* 519 A.2d 147, 153 (D.C.1986) (error not to allow defense to offer evidence of a third party's prior assaults on the victim where the third party had been alone with the victim shortly before her death and the victim may have acquired a new bruise during that time); *Gates, supra,* 481 A.2d at 124–25 (misidentification, look alike defense, where proffer failed to show sufficient similarities between crimes charged and crime for which the defendant was misidentified to meet any of the *Drew* exceptions); *(Michael) Smith v. United States,* 389 A.2d 1356, 1359–60 (D.C.1978) (no error in exclusion of evidence concerning another man who resembled the defendant and had committed an offense somewhat similar to the one with which the defendant was charged, and whose name matched the initials which the victim saw at the scene of the crime; the crime charged and the crime committed by the third person did not have sufficient similarities, photographs of both men "were available for the jury to make comparisons of their features," and victim had selected the defendant from a lineup which also included the third person), *cert. denied,* 439 U.S. 1048, 99 S.Ct. 726, 58

proffers did not even include details that would indicate that the other crimes were committed in a similar manner to the charges against appellant, *e.g.*, robbery with masks. *See Easton, supra,* 533 A.2d at 908; *Drew, supra,* 118 U.S.App.D.C. at 16 & n. 11, 331 F.2d at 90 & n. 11. Further, the defense expert admitted that the shooting could have been done with a gun other than a Lueger. There also was no evidence to support appellant's testimony that Glenmore was at the scene of the shooting. *Cf. Beale, supra,* 465 A.2d at 803. Indeed, the government's eyewitness testimony contradicted appellant's theory that appellant and Glenmore looked so much alike that they could be mistaken for one another; both Ms. Brown and Randy Reed testified that they could distinguish between appellant and Glenmore.

The only proffered evidence suggesting that Glenmore's other crimes were possibly linked to the charges against appellant was the proffered evidence that Glenmore had subsequently shot Eric Forbes, the driver of the car on the night of the shooting. Arguably, this might have shown consciousness of guilt: if Glenmore was the shooter, he may have been trying to remove a potential witness. *But cf. Parks, supra,* 451 A.2d at 606–07. But appellant proffered no evidence to show that the shooting of Forbes was connected to the shooting on July 15, 1989. Since Glenmore and Forbes knew each other well enough to drive to a club together, it was also possible that Glenmore shot Forbes for reasons unrelated to the offenses with which appellant was charged. Consequently, the trial judge's decision to exclude the evidence was "within the range of permissible alternatives." *See generally, (James) Johnson v. United States,* 398 A.2d 354, 365 (D.C. 1979).[27]

 But, even if the judge erred, the defense suffered little, if any, prejudice. *See (Larry) Lee v. United States,* 454 A.2d 770, 775 (D.C.1982). Not only was the misidentification defense clearly before the jury, but much of the proffered evidence was brought before the jury through the testimony of defense witness Nathanial Matthews.[28] Only the proffered evidence that Glenmore had later allegedly shot Eric Forbes and that he had shot someone else from the same distance that the shooter hit Tony Reed was not before the jury. However, Matthews testified that he saw Glenmore with a gun when Forbes was shot. Moreover, defense counsel argued in her opening statement to the jury that the real perpetrator was a "stick-up man by trade" who had committed other robberies in neighborhoods near 12th Street, N.E., that the "true shooter" was "in the habit of sticking up people he knew and he knew Vincent Fl[ythe]," and that the shooter had shot someone else with the same gun that shot Tony Reed. In addition, Glenmore's culpability was not inconsistent with appel-

L.Ed.2d 707 (1978); *cf. Beale, supra,* 465 A.2d at 803 (no evidence linking victim's previous violence against others to the crime charged).

27. Appellant's suggestion that the evidence that Glenmore shot Forbes was admissible under the common plan or scheme exception is meritless. *See Easton, supra,* 533 A.2d at 908.

28. When asked when he had seen Glenmore with the Lueger, Mr. Matthews answered, "[h]e [Glenmore] shot at somebody with it [the gun], and I seen him." When asked "July 15, 1989, did you see Maurice Glenmore with that Lueger?", the witness answered, "When Eric Forbes got shot." Matthews also testified that Glenmore and Rico Thomas once borrowed a car from Matthews and others "and they robbed somebody in our car, and we got shot at." The prosecutor's cross-examination of Matthews re-emphasized the information about Glenmore's other crimes. The prosecutor asked, "[a] moment ago you said it was something about a day Eric Forbes was shot ... Is that one of the times ... in June of 1989?" Matthews did not clearly answer this question. The prosecutor asked whether Rico Thomas had told the witness that Glenmore still possessed the Lueger on July 15, 1989. The witness answered "Yes, because they had just robbed somebody." In addition, Andy Williams testified that he saw Glenmore shoot someone with a Lueger.

The judge also allowed defense evidence concerning Glenmore's possession of a Lueger. The judge noted that the evidence had passed the threshold of *Johnson, supra,* 552 A.2d 513, which concerned evidence that a third person had committed the crime. The judge also weighed the probative value and prejudicial impact of the evidence.

lant's guilt as an aider and abetter.[29] *See Brown, supra,* 409 A.2d at 1097 (quoting 1 WHARTON'S CRIMINAL EVIDENCE § 195 at 404 (13th ed. 1972)); *see also Shepard, supra,* 538 A.2d at 1117 (citations omitted). Consequently, as in *Shepard, supra,* 538 A.2d at 1118, "we cannot say that the evidence offered by appellant was so clearly connected to the issue of his guilt or innocence that its exclusion raised the spectre of constitutional infirmity." *See Johnson, supra,* 552 A.2d at 517.

Therefore, we agree with the government's evaluation that, under these circumstances, admission of further "attenuated evidence of Glenmore's 'other crimes' would not have bolstered appellant's case or diminished the strong case submitted by the government."

## IV.

■ Finally, appellant contends, and the government agrees, that his conviction for assault with a dangerous weapon, D.C.Code § 22–502 (Repl.1989), merges with his conviction for attempted armed robbery, D.C.Code §§ 22–2901 (Repl.1989), –3202 (Supp.1992).[30] The court has held that armed robbery and assault with a dangerous weapon merge where both offenses are committed against the same victim as part of the same criminal incident. *See, e.g., Harling v. United States,* 460 A.2d 571, 574 (D.C.1983); *Leftwitch v. United States,* 460 A.2d 993, 996 (D.C.1983). *See generally Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932) (test for whether two offenses merge is whether each crime "requires proof of an additional fact which the other does not"). In the instant case the attempted armed robbery and the assault with a dangerous weapon were committed against the same victim, Vincent Flythe, and achieved by the same action of placing a gun against Mr. Flythe's stomach and demanding his money. Therefore, we agree that the offenses merge.

■ On appeal, neither appellant nor the government addresses the question of whether, once the conviction for assault with a dangerous weapon merges with the conviction for attempted armed robbery, appellant's conviction for possession of a firearm during a crime of violence or dangerous offense (assault with a dangerous weapon) merges with his conviction for possession of a firearm during a crime of violence or dangerous offense (attempted armed robbery).[31] Nevertheless, we hold that these two convictions merge because they concern violations of the same statute, D.C.Code § 22–3204(b), by the same actions (placing a gun against Mr. Flythe's stomach and demanding his money), and there is no indication that the legislature intended to allow multiple sentences in such circumstances. *See Bean v. United States,* 576 A.2d 187 (D.C.1990) (merger issue raised *sua sponte* by this court).

■ Although the court has rejected the use of a fact-based test for merger where a defendant is convicted under two or more statutes and adopted the *Blockburger* test,[32] *Byrd v. United States,* 598

29. A reasonable jury could reasonably find appellant guilty as an aider and abettor even if it believed that Glenmore was the actual shooter. The jury could have believed that appellant was one of the three masked robbers, but not the shooter, or, possibly, that appellant stayed in the car but assisted in the robbery by serving as a lookout. *Cf. Parks, supra,* 451 A.2d at 641 n. 49. However, if Glenmore was the shooter, then the eyewitness identifications of appellant as the shooter were incorrect and there was no evidence to show that appellant was one of the robbers in the street rather than one of the men who stayed in or near the car. Glenmore's guilt thus seems relevant, but not inconsistent with appellant's culpability.

30. At sentencing, the judge stated that he was "not going to handle the merger problems," but was going to give concurrent sentences for assault with a deadly weapon and attempted armed robbery partly because he believed that those convictions might merge.

31. At sentencing, the prosecutor stated that "[i]t's the Government's position that the only charges which merge for which the Defendant cannot be given consecutive time for would be the three counts of Possession with [sic] a Firearm During the Crime of Violence."

32. The *Blockburger* test provides that:
 [w]here the same act or transaction constitutes a violation of *two distinct statutory pro-*

A.2d 386, 389–90 (D.C.1991) (en banc), a fact-based approach remains appropriate where a defendant is convicted of two violations of the same statute. *See Joiner v. United States,* 585 A.2d 176, 179 & n. 2 (D.C.1991); *see also Briscoe v. United States,* 528 A.2d 1243, 1245 (D.C.1987) (*Blockburger* inapplicable to merger of two violations of same statute); *Bean, supra,* 576 A.2d at 189 n. 3. Finding no evidence that the legislature clearly intended to allow multiple punishments under § 22–3204(b) for the same course of conduct, *see Bean, supra,* 576 A.2d at 190 ("at issue is whether or not the legislature expressed a clear intention in the language of § 22–3204 that *does* allow multiple convictions"), we conclude that two of appellant's convictions for possession of a firearm during a crime of violence merge with each other. *Cf. id.* (two convictions under § 22–3204(a) for possession of two different weapons merge) (citing *Cormier v. United States,* 137 A.2d 212 (D.C.1957) (merger of separate convictions for carrying several unlicensed pistols), and *Chapman v. United States,* 493 A.2d 1026, 1029 (D.C.1985) (collateral consequences)); *Briscoe, supra,* 528 A.2d at 1246 (in drug possession case, possession "is more appropriately described as a course of conduct than an act," and therefore a statute criminalizing possession does not intend multiple punishments for several instances of possession occurring at the same time and place, at least where the punishments would not serve different societal interests) (citing *United States v. Jones,* 533 F.2d 1387, 1390–91 (6th Cir. 1976), *cert. denied,* 431 U.S. 964, 97 S.Ct. 2919, 53 L.Ed.2d 1059 (1977) (no multiple punishment for three instances of weapon possession)).[33] Thus, under § 22–3204(b), which provides that "[n]o person shall ... possess a pistol ... or any other firearm ... while committing a crime of violence or dangerous crime," where appellant's convictions for assault with a dangerous weapon and attempted armed robbery merge to become one "crime of violence or dangerous crime," there can be only one associated offense of possession of a firearm during a crime of violence.

Accordingly, we remand the case to the trial court to vacate appellant's convictions for assault with a dangerous weapon and the single count of possession of a firearm during commission of the assault with a dangerous weapon, and we otherwise affirm.

---

visions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.

*Id.* 284 U.S. at 304, 52 S.Ct. at 182. (emphasis added).

**33.** A conviction of possession of a firearm during a crime of violence or dangerous offense will not merge with a conviction for the relevant dangerous offense. *See e.g., Freeman v. U.S.,* 600 A.2d 1070, 1073 (D.C.1991); *(Michael) Thomas v. United States,* 602 A.2d 647, 650 (D.C. 1992).